IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTATE OF MARK PARSONS, by and through its Administrators, et al. | : | |
| | : | |
| Plaintiffs, | : | Civil No. 07-cv-1847 (JR) |
| | : | |
| v. | : | |
| | : | |
| THE PALESTINIAN AUTHORITY, et al | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**PRELIMINARY STATEMENT**

This is an action for wrongful death, personal injury, international terrorism and related torts pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331, *et. seq*., by the family members and the administrator of the Estate of Mark Parsons, all American citizens, who was murdered on October 15, 2003 in a terrorist attack when the U.S. government supported vehicle in which Mark Parsons was riding, was blown up by a terrorist-placed, remote-controlled-bomb. Mr.Parsons was a U.S. employee of DynCorp, a U.S. entity on contract with the U.S. Department of State.   At the time of the bombing, Mr. Parsons was riding in the vehicle to perform functions for and on behalf of and related to the mission, interests and activities of the U.S. government.

The Defendants in this action are the Palestinian Authority ("PA") and the Palestinian Liberation Organization ("PLO") (hereafter collectively "PA/PLO").  As alleged in the Complaint, the Defendants PA and PLO, through the Palestinian Preventive Security apparatus, maintained in the Gaza Strip and elsewhere, established and

thereafter materially supported factories and workshops for the sole purpose of producing hundreds of mortar bombs, explosive charges, rifle grenade launchers, rockets and other weapons and instrumentalities of terrorism. (Complaint, ¶11). The Palestinian Preventive Security apparatus is an entity which at all times relevant hereto was under the direct control of the PA and PLO. (Complaint, ¶12).

On October 12, 2007, Plaintiffs filed their Complaint against the Defendants for the damages resulting from the murder of Mark Parsons in this terrorist attack. Following the filing of the Complaint, the Defendants, the PA and the PLO were served with process on the 26th of November, 2007 in accordance with Fed. R. of Civ. P. 4(e)(2) and (h)(1). On February 15, 2008, the Defendants filed a Motion to Dismiss. In their Motion, the Defendants argue (i) the Court does not have personal jurisdiction over the Defendants due to insufficient minimum contacts; (ii) the Plaintiffs have failed to state a cause of action under the ATA and have failed to plead a plausible cause of action required pursuant to *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007); (iii) the Plaintiffs' claims should be barred as they raise a political question; (iv) the Plaintiffs' state law claims should be dismissed as a result of the PLO/PA's status as an unincorporated association and finally (v) that the Plaintiffs' claims should be dismissed under the doctrine of laches. This Court should deny the Defendants' motion on each of the foregoing grounds, as the Plaintiffs will show that (a) these Defendants have sufficient minimum contacts such that the assertion of personal jurisdiction over them does not offend the traditional notions of fair play and substantial justice, (b) the Plaintiffs have alleged sufficient facts and allegations in their Complaint to put forth a cause of action of under the ATA and have put forth a plausible claim as required by the

Supreme Court, even taking into consideration the standards as they are set forth in *Twombly*; (c) that the political question doctrine is inapplicable in this case, as it has been deemed to be in other cases where these same Defendants have been sued for the participation and support of acts of terrorism (d) the Court should hear Plaintiffs' state law claims using its discretion to assert supplemental jurisdiction and (e) the Plaintiffs properly brought their claims within the applicable four year statute of limitations, and accordingly, their timely claims should not be dismissed.

## ARGUMENT

**I.  This Court has  Personal Jurisdiction Over the PA/PLO**

    A.  Standard of Review.

       To survive a motion to dismiss, a plaintiff must make a *prima facie* showing of their case.  However, "the Court must accept the Plaintiff[s'] claims as true . . ."  *Novak-Canzeri v. Turki Bin Abdul Aziz Al Saud*, 864 F. Supp. 203, 206 (D.D.C. 1994), and "factual discrepancies appearing in the record must be resolved in favor of the plaintiff."  *Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990).  Moreover, in ruling on a motion under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, the Court may look outside the allegations of the Plaintiffs' Complaint to determine whether minimum contacts exist.  *See Helmer v. Doletskaya*, 290 F. Supp. 2d 61, 65 (D.D.C. 2003).  Here, the Defendants have failed to submit anything into the record that would challenge the Plaintiffs' *prima facie* showing of the Court's jurisdiction over the Defendants, and the additional evidence the Plaintiffs have submitted further demonstrates that the requisite minimum contacts exist.  Therefore, the Defendants' Motion to Dismiss for lack of personal jurisdiction should be denied.

B.  <u>The PA/PLO Have Sufficient Contacts with the United States.</u>

Currently, as it has for many years, the PA/PLO maintains offices open to the public, has employees and is represented in Washington, D.C. by Afif Safieh.[1]  Mr. Safieh, like his predecessor before him, Hasan Abdel Rahman, serves as the Washington Representative of  the Palestine Liberation Organization and the Palestinian National Authority  *See Washington Report on Middle East Affairs* attached hereto as Ex. A; *Biton v. Palestinian Interim Self Government Authority, et al.*, 310 F. Supp. 2d 172, 179-180, (D.D.C. 2004).  Mr. Safieh was appointed to take Mr. Rahmen's position on October 26, 2005.  See Ex. A.   In his numerous speaking engagements across the United States and interviews in the American press, he is interchangeably referred to as both the representative of the Palestinian Authority and representative of the Palestinian Liberation Organization.  See selection from hundreds of references to Mr. Safieh on www.google.com from interviews and speaking engagements in which Mr. Safieh has participated since his arrival in October 2005 attached hereto as Group Exhibit B, Report of conversation *Charlotte Talks with Mike Collins,* Friday, April 11, 2008, Ambassador Afif Safieh; Report of  lecture by Palestinian Diplomat Afif Safieh at the University Arizona, March 28, 2008; "Delaying the Inevitable, Interview with Afif Safieh", *National Catholic Reporter,* January 19, 2007; Panel Discussion on *Charlie Rose*, May 24, 2006; Report of speaking engagement at San Diego World Affairs Council, March 12, 2007; Interview with KQED, July 27 2006, and excerpts from PLO Mission Web site downloaded April 10, 2008 and January 26, 2007. Accordingly, as Mr. Safieh, like his predecessor Mr. Rahmen, has held himself out as chief spokesman and representative of

---

[1] On November 26, 2007, Mr. Safieh was served with the Complaint and Summons in this matter at his home in Washington, D.C., by personal delivery.

both the PA and the PLO while maintaining his residence in the United States, this Court

may properly attribute Mr. Safieh's contacts to both the PA and the PLO and assert

personal jurisdiction over both entities.

C.  The Activities of the PA/PLO in the United States Have Been Continuous in
    Nature and Justify This Court Finding Personal Jurisdiction Over The
    PA/PLO.

In their moving papers, the Defendants argue the only contacts that the PA/PLO

have are related only to their United Nations and government contacts.  This is simply not

the case.  As the Plaintiffs have clearly demonstrated, the PA/PLO's representatives have,

for a prolonged period of time, and currently, in fact engaged in a continuous and

ongoing US based public relations campaign and outreach to the American people, from

their offices in Washington, DC, including at the time the Complaint in this matter was

filed, advocating the interests of the PA, the PLO and generally on behalf of or related to

both the Palestinian people here in the United States and abroad.  See Group Exhibit B.

Their representatives have given interviews, delivered speeches, attended economic,

business development and other meetings designed to promote business interests and

relationships with Palestinian interests, attended fundraisers and written advocacy pieces

all designed to promote various Palestinian matters, conducted in the United States in the

name of the PA and the PLO.

Not only has Mr. Safieh promoted these interests personally since he arrived in

2005, but prior to his arrival, from 2000-2005, Mr. Rahman engaged in similar speaking

engagements and panel discussions.  See Group Exhibit C.  The *Klinghoffer* court held

speaking in public and to the media in support of the Palestinian cause sufficed to meet

the doing business standard.  *Klinghoffer v. S.N.C. Achille Lauro Lines,* 937 F.2d 44, 52

(2d Cir. 1991). Regardless of what entity the PA/PLO representative claimed to be representing at the time he was speaking and soliciting support, "the form of organization by which a defendant does business is irrelevant to any policy governing acquisition of jurisdiction". *Klinghoffer*, 937 F.2d at 50 (citations omitted). The representatives of the PA/PLO have engaged in much more than the number and type of contacts required for this Court to assert its general personal jurisdiction over them. *See id.* at 52.

Under Fed. R. Civ. P. 4(k)(2), Plaintiffs effected service of process on the PA/PLO by personally serving Mr. Safieh, the very person who the PA and the PLO hold out to the public as their Chief Representative in Washington and in the United States. Effective personal service, when combined with the Defendants' numerous actual and ongoing contacts with the United States as detailed above, mandates that this Court must exercise personal jurisdiction over both the PA and PLO. Rule 4(k)(2) states the following:

> If the exercise of personal jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2). The D.C. Circuit recently held: "Rule 4(k)(2) thus permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani v. Bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). It is uncontrovertable that the first

two elements have been satisfied in this case as (i) the within asserted claims arise under

the federal Antiterrorism Act ("ATA"), 18 U.S.C. §2333 *et seq*. and (ii) a summons has

been properly actually and personally served on Mr. Safieh.

The third element has also been satisfied as the defendants are not subject to the

jurisdiction of any single state court.  "[S]o long as a defendant does not concede to

jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *Mwani*, 417

F.3d at 11 (citing *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 651 (5th Cir.

2004)).  This leaves only the question of whether the fourth element of Fed. R. Civ. P.

4(k)(2) has been satisfied to allow the Court to assert personal jurisdiction over the

PA/PLO.

The fourth element of Rule 4(k)(2) requires that a defendant have minimum

contacts with the forum state and ensures "that the maintenance of the suit does not

offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945) (*quoting Milliken v. Meyer*, 311 U.S. 457, 463

(1940)).  For the purposes of Fed. R. Civ. P. 4(k)(2), whether the Court's exercise of

jurisdiction is "consistent" with the Constitution depends on whether the defendant's

contacts with the United States when taken and viewed as a whole are sufficient for the

exercise of jurisdiction to comport with the Due Process Clause of the Fifth Amendment.

*Mwani*, 417 F.3d at 11.

The essential inquiry under this analysis is whether the defendant "has fair

warning that a particular activity may subject [them] to the jurisdiction of the foreign

sovereign." *Int'l Shoe*, 326 U.S. at 316.  Although "the constitutional touchstone remains

whether the defendant purposefully established 'minimum contacts' in the forum,"

*Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985) (*quoting Int'l Shoe*, 326 U.S. at

316), the "foreseeability" of causing injury in the forum can establish minimum contacts

where "the defendant's conduct and connection with the forum . . . are such that he

should reasonably anticipate being haled into court there." *Id*. (*quoting World Wide

Volkswagon v. Woodson*, 444 U.S. 286, 295 (1980)). As the Plaintiffs' have more than

fully demonstrated, the PA/PLO have gone far beyond merely directing conduct toward

the United States and rather have in fact maintained in various states throughout the

United States, a very public and active continuous presence in the United States, such that

this Court may properly continue to assert personal jurisdiction over these Defendants.

Accordingly, this Court, as each of the other District Courts which have addressed this

issue, should find that it had and continues to have personal jurisdiction over the PA/PLO

Defendants.

    D.   **Defendants misstate the elements for Due Process Analysis under the
       Antiterrorism Act.**

      Finally, the Defendants argue that even if this Court should find substantial

minimum contacts between them and the forum, exercising personal jurisdiction over the

PA/PLO would offend traditional notions of fair play and substantial justice. Actually,

the contrary is true. To deny Plaintiffs' justified entitlement to hale these Defendants into

this Court would deny the Plaintiffs their entitlement to the traditional notions of fair play

and substantial justice. A large portion of the Defendants' brief in support of their

motion is devoted to the application of the due process clause analysis set forth in *Asahi

Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987). (Def. Mem., at

12-14). Under the ATA, however, once the Court is satisfied that a defendant has

sufficient minimum contacts with the United States, then the due process analysis is

satisfied, and no further inquiry is required. *Mwani*, 417 F.3d at 11. The venue provision of the ATA provides that:

> [a]ny civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.

18 U.S.C. § 2334(a). The foregoing provides for nationwide service of process and also impacts the Due Process analysis. "Because the statute provides for nationwide service of process, the relevant Due Process inquiry for personal jurisdiction purposes, assuming that the defendant has been properly served, 'is whether the defendant has had minimum contacts with the United States.'" *Burnett v. Al Baraka Inv. and Development Corp.*, 274 F. Supp. 2d 86, 95-96 (D.D.C. 2003); *Busch v. Buchman, Buchman & O'Brien, Law Firm,* 11 F.3d 1255, 1258 (5th Cir. 1994) (citations omitted). The Defendants' personal jurisdiction argument accordingly fails on its face as the test is (a) service and (b) minimum contacts, particularly as analyzed through the application of the ATA venue provision and the requirements for Due Process analysis in this case.

Accordingly, because the Plaintiffs' causes of action arise under the ATA and they have demonstrated a sufficient amount of the Defendants' minimum contacts with not only Washington, DC, but also throughout United States at least since 2000, there is no question that these Defendants should have reasonably anticipated being haled into Court in the United States to stand trial for the role they have played in supporting and directing terrorist activities against American citizens. *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,153 F. Supp. 2d 76, 88 (D.R.I. 2001) (finding personal jurisdiction over the PA proper in an ATA case when defendants have minimum contacts

with United States as a whole, and have been served in any district where they reside, are found, or have an agent); *Biton v. Palestinian Interim Self Government Authority,* 310 F. Supp. 2d 172, 179-80 n.6 (finding personal jurisdiction over the PA and noting that the defendants do not even challenge personal jurisdiction over the PLO); *Gilmore* v. *Palestinian Interim Self Government Authority*, 422 F. Supp. 2d  96, 102 n.4 (D.D.C. 2006) (finding personal jurisdiction over the PA and the PLO, as the defendants did not even challenge personal jurisdiction over these entities).

In their motion, the Defendants are essentially arguing *forum non conveniens* by citing elements of the *Asahi* test to the Court and by arguing that it is a significant burden on the PA/PLO to defend its actions in the United States.  The ATA, however, specifically envisions actions by American victims of terrorism being brought in U.S. courts, and limits attempts by defendants to force terror victims to litigate the ATA claims in foreign tribunals.  18 U.S.C. § 2334.   Under the ATA, the only circumstance that would permit a court to dismiss a case in favor of a more convenient forum elsewhere is if the defendants were to demonstrate that a foreign court could offer, among other things, "a remedy which is substantially the same as the one available in the courts of the United States."  18 U.S.C. § 2334(d)(3).  The Defendants have neither argued, nor can they demonstrate that the Plaintiffs would be able to receive the same remedy and measure of justice if they were to pursue their cause of action elsewhere, such as in Israel or Gaza in the Palestinian territories, neither of which would provide the measure of justice which Congress envisioned in adopting the ATA and providing remedies in the United States for acts of terrorism conducted elsewhere.  The remedy that the Plaintiffs

seek in this action entitles them to receive treble damages.[2]  The treble damages remedy

is important not only to give the Plaintiffs the full compensation that Congress expressly

intended to give them, but also because it provides an economic deterrent to those who

engage in and support terrorist activity.  Should the Defendants succeed in forcing the

Plaintiffs to be relegated to bringing suit in a foreign jurisdiction with an inferior vehicle

for recovery and deterrence, this would expressly contravene 18 U.S.C. § 2334(d)(3) and

Congress's legislative intent will have been clearly and unjustly thwarted, which cannot

and should not be permitted by this Court, as same would deny the clear entitlement of

the Plaintiffs to seek justice in this Court.

      The Defendants also disingenuously argue that because the Plaintiffs are only

U.S. citizens, (Def. Mem., at 14), this Court should not defer to the Plaintiffs' right to

bring suit in the United States and the Court should ignore the Plaintiffs' choice of forum.

A plaintiff's choice of forum, however, is entitled to substantial deference and should

only be disturbed if the factors favoring an alternative form are compelling.  *Wiwa v.*

*Royal Dutch Petroleum Co.*, 226 F.3d 88, 101 (2d Cir. 2000) (*cert. denied* 532 U.S. 941

(2001)); *Thaye/Patricof Educ. Funding LLC. v. Pryor Resources, Inc.*, 196 F. Supp. 2d

21 (D.D.C. 2002).  To ignore the Plaintiffs' proper choice of forum in the United States

would undercut the ATA's compelling principles that render a defendant's convenience

factor of irrelevant.  *See e.g.*, *Iragoori v. United Technologies Corp.*, 274 F.3d 65. 74-75

(2d Cir. 2001) (finding heightened deference to the plaintiffs' chosen forum applies even

where plaintiff has resided in a foreign jurisdiction).  Plaintiffs' choice of forum, favored

under the principles of the ATA, should not be disturbed in this case.

---

[2] Plaintiffs are not aware of any cause of action that would allow a treble damage remedy to the plaintiffs where jurisdiction might be obtained over these defendants

Furthermore, there is a clear public interest in providing U.S. citizens with the ability to bring a cause of action in a United States District court for damages sustained as a result of the terrorist acts abroad. The ATA was specifically drafted and enacted to provide our citizenry, no matter where they may be, with an opportunity to seek redress in the United States federal court system when they fall victim to these types of tragic and murderous terrorist attacks. The express purpose of the ATA was, in large part, to cut off the support and financing of terrorists and their terrorist organizations. *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1011 (7th Cir. 2002) (*Boim* I) (referencing the Senate Hearing on the ATA that the deterrence of the support of terrorist activities would not only help benefit victims but also help to deter terrorism itself). Thus, the Court has a clear interest in adjudicating the claims of--as in this case before it--an American citizen who was brutally and senselessly murdered in a terrorist attack which targeted the very US convoy in which he was traveling. This interest is even more so in light of U.S. policy to hold those, such as the PA/PLO, who support terrorist organizations and their operatives fully accountable for their actions and support for terrorist acts under the ATA. Accordingly, when considering all of the factors required in making a substantial justice analysis under the Due Process Clause and in accordance with the ATA, this Court should find that due process requires the Court to find that the Plaintiffs are entitled to maintain this action in this Court and that it has personal jurisdiction in this District over the PA/PLO.

In the event, however, the Court questions that as to whether or not the contacts between the Defendants and the United States rise to the required level to assert personal jurisdiction, in the alternative the Plaintiffs would ask the Court to allow the Plaintiffs to

exercise at this stage of the proceedings their right to engage in jurisdictional discovery to

discover additional evidence and bring before the Court the evidence that the Plaintiffs

believes to exist as more than sufficient to support the Court's assertion of personal

jurisdiction.  *See Edmond v. U.S. Postal Service General Counsel*, 949 F.2d 415, 425

(D.C. Cir. 1991) (stating that "[a]s a general matter, discovery under the Federal Rules of

Civil Procedure should be freely permitted, and this is no less true when discovery is

directed to personal jurisdiction."); *see also GTE New Media Services, Inc. v. BellSouth

Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) (holding that "[i]f a party demonstrates that

it can supplement its jurisdictional allegations through discovery, then jurisdictional

discovery is justified.").

## II.    The Plaintiffs Have Stated Claims For Which Relief May Be Granted.

### A.    The Plaintiffs have Pled a Proper Cause of Action Under the ATA

Plaintiffs have brought suit under the ATA.  The ATA permits U.S. nationals who

have been injured or killed "by reason of an act of international terrorism" to sue for their

injuries in U.S. federal court and to recover damages, including treble damages.   18

U.S.C. § 2333(a).   "International terrorism" is  defined to include conduct that (a)

"involve[s] violent acts or acts dangerous to human life that are a violation of the

criminal laws of the United States or of any State, or that would be a criminal violation if

committed within the jurisdiction of the United States or of any State"; (b) appears

intended "to intimidate or coerce a civilian population," to influence government policy

through intimidation or coercion, or to affect the conduct of government by means of

mass destruction, assassination, or kidnapping; and (c) occurs primarily outside of the

United States or transcends national boundaries.  18 U.S.C. § 2331(1).  *Boim v. Holy*

*Land Foundation for Relief and Development,* 511 F.3d 707, 714 (7th Cir. 2007) (*Boim II*).  In bringing claims against the Defendants who are supporters, facilitators and aiders and abettors of terrorists, the Plaintiffs have carried out the clear intent and mandate of Congress.  Congress has explicitly granted private parties the right [under the ATA] to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations.  *Strauss v. Credit Lyonnais, S.A.,* 242 F.R.D. 199, 214-215 (E.D.N.Y. 2007); *see also Weiss v. National Westminister Bank, PLC*,  242 F.R.D. 33 (E.D.N.Y. 2007).  "Congress intended these provisions [under Section 2333(a) of the ATA] to impose 'liability at any point along the causal chain of terrorism.'"  *Strauss*, at 215 (citation omitted).  Here, Plaintiffs have alleged the PA/PLO's support for, and direct participation in, the criminal act which resulted in the murder of Mark Parsons, *inter alia*, by establishing, funding and supporting the bomb-making factory in Gaza that manufactured bombs and provided them to various known terrorist organizations, including the bomb that killed Mark Parsons.  Because this would establish criminal liability under the federal statutes for conspiracy to commit murder (in violation of 18 U.S.C. § 2332(b)), criminal liability by providing of material support to terrorists (in violation 18 U.S.C. § 2339A) and criminal liability by providing material support to Foreign Terrorist Organizations (in violation of 18 U.S.C. § 2339B(a)(1)), Plaintiffs are fully entitled to allege a cause of action against these Defendants under the ATA.

Defendants have dedicated a significant portion of their brief in support of their Motion to Dismiss to a discussion of the *Boim I* and *Boim II* decisions.  Nothing that the Defendants cite in their recitation denies Plaintiffs claims under the ATA.  Rather what

*Boim II* and *Boim I* reiterate is that in pleading a case under the ATA, Plaintiffs do not need to establish a direct link between the Defendants' support and conduct and the actual attack that resulted in the murder of Mark Parsons. *Boim II* at 741. *Boim II* goes on to state that at trial, or in dispositive pleadings before a trial, plaintiffs must offer some proof that permits a finding by a preponderance of the evidence a defendant's conduct was a "cause in fact" of the terrorist act at issue. *Id.* As the *Boim II* court held, "a defendant's conduct need not be the sole circumstance responsible for the terrorist act in order to qualify as a cause in fact; it is enough that it be *a* cause of the act and the resulting harm." *Boim II*, at 742 (*citing* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL HARM § 26 comment c).

The *Boim II* court has determined, in a decision presently on appeal and pending a motion for en banc hearing in the 7th Circuit, that the Boim plaintiffs had not established the causal connection between the defendants in the conduct of the terrorist attack that killed David Boim, and has remanded the case back to the district court for further proceedings. It is Plaintiffs' view that it is essential for this Court to distinguish the different procedural posture of the *Boim* case in the instant matter. In *Boim II* the Seventh Circuit was considering an appeal of the *Boim* judgment *after* a trial had been held and the plaintiffs had put forth all of their evidence.

Here, the Plaintiffs have not yet had the opportunity to conduct any discovery, file expert reports and affidavits, and fully present their evidence which will establish by competent evidence that the PA/PLO Defendants were an integral part of the terrorist operation that manufactured the bomb that was used by a terrorist organization to murder Mark Parsons as he traveled in a United States Department of State convoy to interview

potential Fulbright Scholarship applicants.   Plaintiffs have sufficiently set forth facts in their Complaint which fully describe these Defendants' participation and support of the bomb making factories and the terrorist groups that executed the terrorist attack that killed Mark Parsons, and when taken as true, impose liability directly on the PA/PLO under the ATA. *See Gilmore* v. *Palestinian Authority*, 422 F. Supp. 2d 96, 102 (D.D.C. 2006).  The plaintiffs in *Gilmore* v. *Palestinian Authority* similarly alleged that a terrorist attack that killed Mark Gilmore was carried out with the support of the PA and PLO.  *Id.* The Court held in considering defendants motion to dismiss that "these allegations, which must be taken as true at this early stage of the litigation, are more than sufficient to state a claim for international terrorism under the ATA."  *Id.*

 Accordingly, this Court should deny Defendants' Motion to Dismiss Plaintiffs' claims for failing to state a cause of action under the ATA, as the Plaintiffs have clearly pled sufficient facts and allegations in their Complaint, which demonstrate the Defendants' required participation under the ATA.  However, in the event the Court questions the need for the Plaintiffs to pled with greater specificity, even though the Defendants have not filed nor requested of the Plaintiffs a More Definite Statement, Plaintiffs pray this Court will in the alternative permit the Plaintiffs to file an Amended Complaint or a More Definite Statement in further support of the sufficient allegations they believe they have clearly set forth in the Complaint as filed.

B.  The Plaintiffs have Pled a Plausible Facts as Required  by Fed. R. of Civ. P. R. 8 and in Accordance with the Standards set Forth in *Twombly*.

 The *Twombly* opinion does not overturn the pleading landscape for a complaint or for its analysis under Fed. R. Civ. 8.  A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a Complaint.  *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002).

The *Twombly* opinion has not changed the fundamental pleading requirements for this

stage:  a complaint "need only to set forth a short and plan statement of the claim, giving

the defendant fair notice of the claim and upon the grounds upon which it rests."  *Shirk v.*

*Garrow*, 505 F. Supp. 2d 169, 171 (D.D.C. 2007).  In *Twombly*, "the Supreme Court

reaffirmed that Fed. R. Civ. P. 8 'requires only a short plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of

what the …claim is and grounds upon which it rests,' and this standard does not require

detailed factual allegations."  *Phillips v.  County of Allegheny*, 515 F.3d 224, 231 (3d Cir.

2008) (citing *Twombly*, 127 S. Ct. at 1964).  This is not a drastic departure from the

pleading obligations that plaintiffs operated under in the pre-*Twombly* period.

     In *Twombly,* the Supreme Court also reaffirmed that on a Rule 12(b)(6) the facts

as the plaintiff has plead them must be taken as true and that a complaint may not be

dismissed, "merely because it appears unlikely that the plaintiff can prove those fact or

will ultimately prevail on the merits."  *Id.* (citing *Twombly,* 127 S. Ct. at 1964-65, 1969

n.8).  What the *Twombly* Court did say is that once a claim has been asserted by a

plaintiff, it may be supported by <u>any</u> set of facts consistent with the allegations in the

Complaint.  *Twombly*, 127 S. Ct. at 1969 (emphasis added).  The Supreme Court

emphasized that it was neither demanding a heightened pleading standard of specifics nor

imposing a probability standard.  *Id.* at 1964, 1965, 1973 n.14, 1974.  Instead, all that is

required is that there are enough facts to raise a "reasonable expectation that discovery

will reveal evidence of" the necessary elements.  *Id.* at 1965.  This is what the Supreme

Court called the "plausibility standard."  *Id.* at 1968; *Sanders v. District of Columbia*, 522

F. Supp. 2d 83, 87 (D.D.C. 2007). Here, the Plaintiffs have gone far beyond meeting this plausibility standard.

Plaintiffs, have not, as Defendants have suggested, merely presented a "wholly conclusory statement of a claim." (Def. Mem. at 22). Rather, they have put forth specific, factual allegations which show that the Plaintiffs are entitled to relief and have provided the Defendants with fair notice of the nature and extent of the Plaintiffs claims. Fed. R. Civ. P. 8(a)(2). The Plaintiffs' Complaint specifically sets forth that the bomb that killed Mark Parsons (1) was made by the Palestinian Preventive Security services at their bomb making factories (Complaint, ¶16) (2) that the Palestinian Preventive Security apparatus and bomb making factories were set up and funded by the Defendants (Complaint, ¶¶ 26, 27); and (3) that Defendants provided the bomb to the terrorists who carried out the attack on Mark Parsons through the Palestinian Preventive Security apparatus (Complaint, ¶16). The facts alleged in Plaintiffs' Complaint not only demonstrate the PA/PLO's aiding and abetting and material support of the terrorist activities that contributed directly to the death of Mark Parsons, but also their actual and direct participation in the creation, funding and production of bombs at the bomb making factory set up and run by the Defendants' Palestinian Preventive Security apparatus, an instrumentality of the named Defendants.

While these facts alone may not establish every element of the Plaintiffs' claims, under *Twombly*, they are not required to do so. When evaluating the facts in the light most favorable to the Plaintiffs, as required even in the post-*Twombly* period, the Plaintiffs have set forth sufficient facts to at least raise a reasonable expectation that discovery will indeed reveal evidence of the Defendants' liability under the ATA for their

participation and direction in the terrorist atttack that murdered Mr. Parsons and the other

Americans who died that fateful day.  *See Twombly* at 1965.  Accordingly, on these

grounds as well, Defendants' Motion to Dismiss should be denied.

      C.  <u>The Political Question Doctrine is Not Applicable.</u>

The Defendants would like the Court to believe that it is adjudicating the fate of

nations, when, in fact, the Court is applying traditional tort principles to a case

congressionally mandated to be within the jurisdictional cognizance of an Article III

court.  The Defendants wrongly argue that under the political question doctrine the issues

raised are non-justiciable and are not properly the subject of a judicial inquiry.  (Def.

Mem. at 33).  The facts and the law are both solidly against the Defendants in this case;

and, with all due respect, the argument that the Court cannot hear the case is without

merit.

The mere presence of political issues does not make a case inappropriate for

judicial scrutiny.  "This is a tort suit brought under a legislative scheme that Congress

enacted for the express purpose of providing a legal remedy for injuries or death

occasioned by acts of international terrorism."  *Ungar v. Palestinian Liberation*

*Organization*, 402 F.3d 274, 280 (1st Cir. 2005); *Klinghoffer v. S.N.C. Achille Lauro*, 937

F.2d 44, 49 (2nd Cir. 1991) (observing that in a suit arising from a terrorist murder, "[t]he

fact that the issues before us arise in a politically charged context does not convert what

is essentially an ordinary tort suit into a non-justiciable political question.").

The Supreme Court has mandated consideration of the following factors when a

court analyzes the applicability of the political question doctrine:

> Prominent on the surface of any case held to involve a political question is
> found [1] a textually demonstrable constitutional commitment of the issue

> to a coordinate political department; or [2] a lack of judicially
> discoverable and manageable standards for resolving it; or [3] the
> impossibility of deciding without an initial policy determination of a kind
> clearly for nonjudicial discretion; or [4] the impossibility of a court's
> undertaking independent resolution without expressing lack of the respect
> due coordinate branches of government; or [5] an unusual need for
> unquestioning adherence to a political decision already made; or [6] the
> potentiality of embarrassment from multifarious pronouncements by
> various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).  An analysis of the *Baker* factors makes clear

that the political question doctrine is not applicable to this case, as numerous courts have

already determined in various cases, including those where the same Defendants have

been sued by others for their material sponsorship and/or support of and/or involvement

in terrorist activities.

> The results of the application of the first factor underscore the inapplicability of

the political question doctrine in this case.  As noted in *Klinghoffer*, 937 F.2d at 49, the

first *Baker* factor has been isolated as the single most important of the six factors by the

author of *Baker* himself, Justice Brennan.  *Goldwater v. Carter*, 444 U.S. 996, 1006

(1979) (Brennan, J. dissenting).  Here, the case is a tort suit over which the court asserts

subject matter jurisdiction as specifically authorized by Congress.  18 U.S.C. § 2333.

Thus, there is a textually demonstrable constitutional commitment to the Judiciary.  "The

department to whom this issue has been 'constitutionally committed' is none other than

our own--the Judiciary."  *Klinghoffer,* 937 F.2d at 49 (where plaintiffs brought a suit

under the same statute as the plaintiffs in our case); *Knox*, 306 F. Supp. 2d at 449; *see

also Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F. Supp. 2d 289, 347

(S.D.N.Y. 2003) (finding that the presence of a jurisdictional federal statute denotes a

constitutional commitment to the judiciary branch).    Moreover, Congress passed 18

U.S.C. § 2333, thereby explicitly creating jurisdiction for this exact specie of case..

Secondly, there is not a lack of "judicially discoverable and manageable standards

for resolving" this tort case, because the common law "provides clear and well-settled

rules on which the district court can easily rely." *Klinghoffer*, at 49.  Thirdly, the

attribution of civil liability for the death of Mark Parsons does not require an "initial

policy determination of a kind clearly for nonjudicial discretion".  Factors four through

six also weigh solidly against application of the political question doctrine.  "<u>Baker</u>

factors four through six would only be applicable if 'judicial resolution of a question

would contradict prior decisions taken by a political branch in those limited contexts

where such contradiction would seriously interfere with important governmental

interests.'" *Presbyterian Church of Sudan*, 244 F. Supp. 2d at 347 (*quoting Kadic v.*

*Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995)).  There are no prior announcements by any

other political branch of the United States government that would conflict with the

adjudication of this case.  "[I]t is error to suppose that every case or controversy which

touches foreign relations lies beyond judicial cognizance.'" *Kadic*, 70 F.3d at 250

(*quoting Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 229-30 (1986)).

This hollow political question doctrine argument is the centerpiece of the Defendants'

meritless attempt to seek to cause the Court to consider withholding the exercising of its

congressionally authorized jurisdiction.

It is worth noting that the political doctrine argument has been unsuccessfully

advanced on behalf of the PLO and the PA on numerous previous occasions.

*Klinghoffer*, 937 F.2d at 49-50; *Ungar ex. rel. Strachman  v. Palestinian Authority*, 228

F. Supp. 2d 40, 44-47 (D.R.I. 2002), *Knox,* 306 F. Supp. 2d at 448-449; *Klieman v. Palestinian Authority*, 424 F. Supp. 2d 153, 161 (D.D.C. 2006).  The Defendants have attempted to distinguish this case by arguing that this case only has to do with whether the Defendants properly provided the level of security when they were exercising their public safety powers.  The Defendants entirely ignore the allegations in the Complaint that the Plaintiffs have put forth regarding the Defendants' participation in supporting, aiding and abetting and otherwise advancing the terrorist activities that were designed to target United States interests and citizens in Israel, including in the Gaza Strip.  Accordingly, as courts in this District and in other Circuits have already definitively ruled that the cases which arise out of terrorist activities of these particular Defendants do not raise a political question that would bar the Court from maintaining jurisdiction over these matter, Defendants should be collaterally estopped from asserting the political question argument again here for the reasons set forth above, and accordingly, this Court should neither be required to expend its resources in revisiting matters already clearly decided by each court which has reviewed the matter, and should accordingly deny Defendants' Motion to Dismiss.

      D.  Defendants' Are Not a Foreign Government Entitled to Immunity and the Defendants have Supported and Ratified Acts of Terrorism Such That They May Be Held Vicariously Liable.

Defendants argue that they are a foreign government entitled to immunity.  They are not a foreign government, and every U.S. court which has reviewed this issue has so determined.  The long standing statements of the U.S. government, U.S. Department of State, and the actions of the Defendants themselves clearly establish that while the Palestinian people are seeking statehood and hope to have the U.S. and other Western

governments recognize the Palestinian people as a nation-state, they neither are a nation-state today nor are they a foreign government.  The arguments of the Defendants that somehow they should be given some sort of special treatment by the Court because they are "the only foreign government subject to liability under the ATA,"  (Def. Mem. at 37) have been rejected by every other court and must be rejected by this Court.  Courts have made abundantly clear in their decisions pertaining to these Defendants, that the PA/PLO are not a foreign government, and no U.S. court has found them to be a foreign government, and therefore they are liable under the ATA for the acts of terrorism they sponsor, participate and support.  *See Estate of Klieman v. Palestinian Authority*, 424 F. Supp. 2d 153, 160 (D.D.C. 2006) (*citing Ungar v. Palestine Liberation Org.*, 402 F.3d at 282-92); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 422 F. Supp. 2d 96, 100-102 (D.D.C. 2006); *Ungar v. Palestinian Auth.,* 315 F. Supp. 2d 164, 174-87 (D.R.I. 2004); *Biton v. Palestinian Interim Self-Gov't Auth.,* 310 F. Supp.2 d 172, 180-81 (D.D.C. 2004); *Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 430-48 (S.D.N.Y. 2004); *Biton v. Palestinian Interim Self-Gov't Auth.,* 412 F. Supp. 2d 1, 4-5 (D.D.C. 2005).  The Foreign Sovereign Immunities Act is therefore not applicable to this case.

Moreover, although the Defendants assert that they have disavowed terrorist activity, this assertion ignores the overwhelming evidence to the contrary in the public record, including evidence that has not only been recognized by our Executive Branch, but also the courts, and that specifically supports Plaintiffs' allegations that the PA and PLO were directly involved in terrorism during the relevant time period including the specific period of the "Second Intifada", and which includes the actual time when Mark Parsons was murdered.   For example, on April 30, 2003, in a statement officially

published by the White House, the White House spokesman confirmed that "Yasser

Arafat[3] was not a party to peace. Yasser Arafat lied to President Bush…and actively

worked on behalf of terrorists, lying to the President of the United States lying about

Palestinian support…for terrorism." See Exhibit D, p. 7 downloaded from www.

whitehouse.gov/news/releases/2003/04/20030430-10.html. In addition, in 2007,

Secretary of State Rice stated that during the early part of this decade, the "Palestinian

Authority …was … overrun by its ties with terrorism." See Exhibit E., p. 3 downloaded

from www.state.gov:80/secretary/rm/2007/79038.htm. At the time of Mark Parsons'

murder, these Defendants clearly had the undeniable goal of supporting and condoning

the terrorist attacks that were occurring in Israel and in the Gaza Strip. Thus it is entirely

appropriate for liability to be imposed, and the PA/PLO to be held not only directly

liable, but also vicariously liable for the actions carried out by the Palestinian Preventive

Security apparatus in furtherance of the terrorist goals which the Plaintiffs have alleged to

have been  supported, funded and controlled by the Defendants.

There are several theories of vicarious liability "such as conspiracy, aiding and

abetting and inducement." *Ben-Rafael v. Islamic Republic of Iran*, 2008 WL 48509

1,*13 (D.D.C. 2008) (*quoting Valore v. Islamic Republic of Iran,* 478 F. Supp. 2d 101,

108 (D.D.C. 2007)). One theory is sufficient to establish vicarious liability, and once a

court finds liability under one theory, it need not consider the others. *See id.* at 109 n.8.

The Defendants will be found "liable under the civil conspiracy theory of vicarious

liability if there was '(1) an agreement between two or more persons; (2) to participate in

an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury or death

caused by an unlawful overt act performed by one of the parties to the agreement (4)

---

[3]Yasser Arafat was the recognized leader of the PA and PLO until his subsequent death.

pursuant to, and in furtherance of, the common scheme.'" *Ben Rafael*, 2008 WL 485091

at *13 (*quoting Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 84)

(D.D.C.2006)(internal citations omitted.)  The allegations in the Complaint in this case

sufficiently plead a civil conspiracy between Defendants, the Palestinian Preventive

Security apparatus and other terrorist organizations, including but not limited to Hamas

and the Popular Resistance Committees ("PRC"), under District of Columbia law.

"[S]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist

attacks." *Bodoff,* 424 F. Supp. 2d at 84.  Because Plaintiffs' Complaint sufficiently sets

forth their allegations to put these Defendants on notice of their liability for Plaintiffs'

claims, dismissal of Plaintiffs' Complaint is not appropriate and accordingly, on these

grounds as well this Court should deny Defendants' Motion to Dismiss.

### III.    Plaintiffs May Assert Their State Law Causes of Action Against Defendants Under D.C. Law.

The Defendants erroneously argue in their Motion to Dismiss that Plaintiffs

may not assert causes of action against the PA or PLO in their own name under D.C. law

other than the federal law causes of action under the ATA.  The Plaintiffs may assert their

state law claims alongside their federal claims under 28 U.S.C. § 1367.  When a federal

court has an independent basis for exercising federal jurisdiction, it may, in certain

circumstances, also exercise [pendent] jurisdiction over related claims under state law."

*Davis v. Am. Soc'y of Civ. Eng'rs*, 290 F. Supp. 2d 116, 123 (D.D.C. 2003) (*citing Women

Prisoners of the Dist. of Columbia Dep't of Corr.* v. District of Columbia, 320 U.S. App.

D.C. 247, 93 F.3d 910, 920 (D.C. Cir. 1996)).  The Court has independent basis for

exercising federal jurisdiction under the ATA.  The Supreme Court enunciated a two-part

test to determine whether a federal court should exercise supplemental jurisdiction under

28 U.S.C. § 1367:

> In United Mine Workers of America v. Gibbs, 383 U.S. 715, 16 L. Ed. 2d
> 218, 86 S. Ct. 1130 (1966), the Supreme Court crafted a two-part test to
> determine when the assertion of jurisdiction over a state law claim is
> appropriate. First, the district court must determine whether the state and
> the federal claims "derive from a common nucleus of operative fact"; if
> they do, the court has the power, under Article III of the Constitution, to
> hear the state claim. Id. at 725. Second, even if it concludes that it has that
> power, the district court must then decide whether to exercise its
> *discretion* to assert jurisdiction over the state issue. <u>Id.</u> at 726.

*Women Prisoners of the D.C. Dep't of Corrections v. District of Columbia*, 93 F.3d 910,

920 (D.C. Cir. 1996).  In this case, the federal and state claims all derive from a common

nucleus of operative fact.  The second part of the Supreme Court's test was whether the

court should exercise its discretion.  "[T]he decision to exercise supplemental jurisdiction

is within the sound discretion of the Court."  *Empagran, S.A. v. F. Hoffman-La Roche

Ltd.*, 453 F. Supp. 2d 1, 9 (D.D.C. 2006).   The Court should exercise supplemental

jurisdiction to hear the Plaintiffs' state law claims in this case.


**IV.**    <u>**Plaintiffs Timely Brought Their Cause of Action within the Applicable
Statute of Limitations.**</u>

Finally, notwithstanding the fact that the Plaintiffs filed their Complaint within

the applicable statute of limitations, Defendants argue for an extraordinary result to

which they are not entitled:  the application of laches, an equitable doctrine, in an attempt

to bar Plaintiffs' lawsuit, which consists purely of claims at-law, brought within the

congressionally-mandated time frame created by the controlling statute of limitations.

The defense of laches cannot be applied in suits founded upon pure claims-at-law.  "First,

laches is a doctrine that applies only in equity to bar equitable actions, not at law to bar

legal actions." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797 (4th Cir.

2001).

> The Court also notes that Crocker's particular claims here for back pay and reinstatement lie in law and equity respectively, This is a distinction that continues to matter in questions of timeliness of filing suit, despite the long ago merger of common law and equity procedure in federal courts. *If an action were brought exclusively at law, then the question of timeliness of filing was governed by strict application of the appropriate statute of limitations.* If brought exclusively in equity, the issue was resolved by application of the equitable doctrine of laches. But if the courts of law and equity had concurrent jurisdiction to enforce the claimant's right, then both remedies had to be brought within the period set by the statute of limitations. Id. at 942-943. Further, laches might nevertheless extinguish the equitable remedy even before expiration of the statute.

*Crocker v. Piedmont Aviation*, 696 F. Supp. 685, 690 (D.D.C. 1988) (*reversed on other*

*grounds Crocker v. Piedmont Aviation*, 933 F.2d 1024, 1029 (D.C. Cir. 1991) (*citing*

*Saffron v. Department of Navy*, 561 F.2d 938, 943 (D.C. Cir. 1977) (emphasis added)).

Defendant cannot cite a single D.C. Circuit decision that would apply the doctrine of

laches to a pure claim-at-law. Defendants instead cite to *Walters v. Secretary of Defense*,

725 F.2d 107, 111 (D.C. Cir. 1983), for the irrelevant proposition that the D.C. Circuit

has found that 28 U.S.C. § 2401(a), a statute of limitations, was applicable to claims in

equity. (Def. Mem., at 42-43). Defendants note the "creation of a single civil action

abolished the rule in which statute of limitations were generally deemed purely legal

defenses, inapplicable to equitable claims." *Id.* This holding nevertheless does not

support Defendants' contention that the doctrine of laches may be applied to pure claims-

at-law.

Furthermore, the *Walters* decision was predicated in part upon the specific

language of the applicable statute of limitations, 28 U.S.C. § 2401(a), which Congress

changed in 1948 to bar "every civil action" not properly filed within the required time

period from the pre-1948 version of the statute that barred all "suits". 725 F.2d at 111

(*citing Saffron v. Department of Navy*, 561 F.2d 938, 946 (D.C. Cir. 1977). This change

in statutory language eliminated "any possible distinction under the statute between legal

and equitable claims". *Id.* In this case, there is no such statutory change or existing

language in 18 U.S.C. § 2335 to support the elimination of the distinction between legal

and equitable claims.

The relevant statute of limitations in this case, 18 U.S.C. § 2335, explicitly applies

to "a suit for recovery of damages under section 2333" and further precludes the

application of the doctrine of laches. An unexpired statute of limitations that controls the

claims-at-law asserted in a lawsuit precludes the application of the laches doctrine by a

defendant. "Moreover, it has been persuasively held that where 'there is an applicable

statute of limitations which has not yet expired, . . . [a] defendant cannot rely on laches as

a defense.'" *Connors v. Hi-Heat Coal Co.*, 772 F. Supp. 1, 3 n.1 (D.D.C. 1991) (*citing

Combs v. Western Coal Corp.*, 611 F. Supp. 917, 920 (D.D.C. 1985)); *United States v.

Mack*, 295 U.S. 480, 489 (1935) ("[L]aches is not a defense to an action filed within the

applicable statute of limitations . . . ."); *Elliott's Enters. v. Flying J, Inc.*, 1998 U.S. App.

LEXIS 6793 at *8 (4th Cir. 1998) ("Further, when a complainant presents mixed claims--

that is, legal and equitable--courts have held that laches may be raised as a defense to the

equitable claims alone."); *Ivani Contr. Corp. v. City of New York*, 103 F.3d 257, 261 (2d

Cir. 1997); *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 169 (8th Cir. 1995)

(en banc) (*abrogation on other grounds recognized by Madison v. IBP, Inc.*, 330 F.3d

1051, 1057 (8th Cir. 2003)); *Miller v. Maxwell's Int'l*, 991 F.2d 583, 586 (9th Cir. 1993)

("[T]he doctrine of laches is inapplicable when Congress has provided a statute of

limitations to govern the action."); *U.S. v. Repass*, 688 F.2d 154, 158 (2d Cir. 1982).

Plaintiffs in this case timely filed their lawsuit on October 12, 2007, prior to the

expiration of the four year statute of limitations established by Congress in 18 U.S.C. §

2335. Their timely filing of this lawsuit under 18 U.S.C. § 2335 therefore precludes the

application of a common law or equitable doctrine, including the doctrine of laches.

Even if the Court were to apply the doctrine of laches to the case at hand, the

Court would find what the Defendants allege as a filing delay insubstantial and without

the kind of prejudice cognizable by the Court under the laches doctrine. Here, less than

four years passed prior to the filing of this lawsuit, a period of time within the statute of

limitations and on its face not substantial enough to merit the dismissal of the lawsuit

under the laches doctrine. *See NAACP v. NAACP Legal Defense & Educational Fund,*

*Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985) ("Here almost thirteen years passed from 1966

through 1978 during which this case was ripe for judgment"). The case law on the

doctrine of laches does not consider a period less than four years to be a significant delay.

Moreover, to prevail upon the affirmative defense of a laches doctrine argument,

the Defendants must also provide evidence that the delay caused prejudice, which they

have not done. *See e.g.*, *Allen v. Card*, 799 F. Supp. 158, 165 (D.D.C. 1992). The

burden of proving the affirmative defense of laches is upon Defendants. *Pro-Football,*

*Inc. v. Harjo*, 284 F. Supp. 2d 96, 137 (D.D.C. 2003). Defendants in this case have not

provided any affidavits or any other evidence of prejudice. Statements that Gaza is now

"inaccessible for the purpose of conducting discovery" or "changed circumstances in

Gaza in 2007 will result in immense prejudice to Defendants", (Def. Mem. at 43),

without any support, even if those issues were relevant, which the Plaintiffs do not

concede, neither constitutes evidence of prejudice, nor does a lawyer's argument in a motion to dismiss suffice as evidence.

Furthermore, Defendants' absurd and similarly unsupported statement "[w]hile Plaintiffs have had over four years to research and prepare claims, they waited until after Gaza was firmly out of control of the Defendants prior to filing their claims", (Mot. Dismiss p. 44), misleads the Court by attempting to impose some burden on the Plaintiffs for matters that are wholly beyond their control or ability to forecast: actions of the terrorist organization Hamas in taking temporary control of Gaza, as if somehow that is relevant to the issues before the Court. Moreover, it misplaces the issue as to the identity of the party who is truly burdened by the uprising in Gaza.

The Defendants cannot rely upon unsupported contentions to demonstrate the claimed prejudice required under the laches doctrine. Accordingly, as it is clear that the doctrine of laches, a bar in equity, does not apply to this matter, this Court on these grounds as well should deny Defendants' Motion to Dismiss.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above and for those to be set out at any hearing to be held on this matter, this Court should deny Defendants' Motion to Dismiss on all grounds and permit discovery to convene forthwith.

April 18, 2008          Respectfully Submitted,

HEIDEMAN NUDELMAN & KALIK P.C.
1146 19th Street, 5th Floor
Washington, DC 20036
Telephone: 202-463-1818
Telefax: 202-463-2999
Email: attorneys@hnklaw.com

By:____/s/ Richard D. Heideman_____
_____/s/ Tracy Reichman Kalik_____
Richard D. Heideman (No. 377462)
Noel J. Nudelman (No. 449969)
Tracy Reichman Kalik (No. 462055)

THE PERLES LAW FIRM, P.C.
1146 19th Street, 5th Floor
Washington, DC  20036
Telephone: 202-745-1300
Telefax:    202-365-4815

By:____/s/ Steven R. Perles_____
Steven R. Perles, Esq. (No 326975)
Edward MacAllister  (No. 494558)

Counsel for the Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this the 18th day of April, 2008 a true and accurate copy of the foregoing, Plaintiffs' Opposition to Defendants' Motion to Dismiss, was served via the U.S. District Court for the District of Columbia's ECF filing system as counsel of record for the defendants:

Richard A. Hibey
Mark J. Rochon
Laura G. Ferguson
Matthew T. Reinhard
MILLER & CHEVALIER CHTD.
655 15th St., N.W., Suite 900
Washington D.C.  20005-6701

___/s/ Tracy Reichman Kalik____

# Exhibit A

Palestinian Ambassador Afif Safieh arrives in Washington, DC on Oct. 26                    Page 1 of 3



# *WASHINGTON REPORT ON MIDDLE EAST AFFAIRS*

## Press Advisory

Palestinian Ambassador Afif Safieh will arrive in Washington, DC on Oct. 26 to assume his duties as Palestine's representative, replacing Palestine National Authority (PNA) Representative in the United States Hasan Abdel Rahman, who will become the PNA's Ambassador to Morocco. Ambassador Afif Safieh served as the Palestinian General Delegate to the United Kingdom and to the Holy See from 1990-2005.

## According to Israel's *Haaretz* newspaper:

Afif Safieh is considered the most articulate Palestinian diplomat in Europe, and possibly the world. The most experienced speakers the foreign ministry can muster have been sent to face off against him in international conferences and on BBC talk shows, and they have run into difficulty opposite the Jerusalem-born Palestinian with the rich vocabulary and smooth delivery.

—*Akiva Eldar, Haaretz, July 22, 2002*

The *Washington Report on Middle East Affairs* is proud that Ambassador Safieh has been an eloquent and frequent contributor to our magazine over the years. Examples of his powerful pen and words include:

## SOME OF THE ARTICLES BY AMBASSADOR SAFIEH PUBLISHED IN THE *WASHINGTON REPORT:*

**In Memoriam Yasser Arafat**
**Our Own Palestinian De Gaulle**
January/February 2005, pages 38-46
http://www.wrmea.com/archives/Jan_Feb_2005/0501038.html

**Children of a Lesser God?**
Four Views on U.S. Foreign Policy, November 2001, pages 13-14
http://www.wrmea.com/archives/november01/0111012.html

## LETTERS WRITTEN BY AFIF SAFIEH "OTHER PEOPLE'S MAIL":

**America and the Arabs**
December 2002, pages 43-46
http://www.wrmea.com/archives/december02/0212043.html

**Israel Harming U.S. Interests**
July 2001, pages 43-44
http://www.wrmea.com/archives/july01/0107043.html

## COVERAGE of AFIF SAFIEH IN THE *WASHINGTON REPORT:*

**Afif Safieh Tells Holy Land Foundation Dinner Guests of Grave Problems Facing Christians in the Holy Land**
July 2000, pages 94-102
http://www.washington-report.org/backissues/072000/0007094.html

**Palestinian Christians "Alarmed" Over Prospects in Holy Land**
January/February 1998, pages 120-122
http://www.washington-report.org/backissues/0198/9801120.htm

**Afif Safieh Addresses NAAA**
July/August 1998, Pages 65-69
http://www.washington-report.org/backissues/0798/9807065.html

**Palestinian Delegate Barred**
April/May 1995, Pages 22-25
http://www.washington-report.org/backissues/0495/9504022.htm

## Afif Safieh's Biographical Information:

- Afif Safieh was born in Jerusalem in 1950
- Studied in Jerusalem at the "College Des Fre'res".
- In 1972, he obtained his license in Political Science and International Relations from the Catholic University of Louvain, Belgium.
- In 1974, he finished his cycle superieur (3eme cycle) en Sciences Politiques from the foundation Nationale des Sciences Politiques, Paris.
- He was President of the Belgian section of the General Union of Palestinian Students from 1969 until 1971, then President of the French branch in 1974-1975.
- Between 1976 and 1978, he was deputy director of the Palestine Lebration Organisation Observer Mission to the United Nations, Geneva.
- Between 1978 and 1981, he was staff member in President Arafat's office in Beirut, in charge of European Affairs and UN institutions.
- Between 1981 and 1985, he was a researcher at the Centre for European Studies in the Catholic University of Louvain, Belgium.
- Between 1985 and 1987, he was visiting scholar at the Centre for International Affairs, Harvard University.
- From 1987 until 1990, he was PLO representative to the Netherlands.
- He was involved in November-December 1988 Stockholm negotiations that led to the official and direct American-Palestinian dialogue.
- September 1990- October 2005 - the Palestinian General Delegate to the United Kingdom.
- In January 1995, he was invited to join the International Board of Trustees of Bethlehem University, the Vatican-sponsored University in Palestine.
- Nominated Palestinian General Delegate to the Holy See, he presented his letter of credentials to His Holiness Pope John II on November 6, 1995.
- Compilations of his articles have appeared in two books:
    - *Self determination*, published by Al-Fajr printing press, Jerusalem, 1986 (jointly with his wife Christ'l Leclercq) and
    - *One people Too Many*—published in the Hague in 1987. He has also published three booklets: 1-Children of a Lesser God? 2- The end of pre-history, 3- On Palestinian diplomacy, published by the Palestinian General Delegation to the United Kingdom, by GA-Type Printers.

- He is married to Christ'l Leclercq and has two daughters: Diana and Randa.

The Washington Report on Middle East Affairs, PO Box 53062, Washington DC 20009. Phone: (202) 939-6050, Fax: (202) 265-4574. Toll Free: (800) 368-5788, www.wrmea.com Published by the American Educational Trust, a non-profit foundation incorporated in Washington, DC to provide the American public with balanced and accurate information concerning U.S. relations with Middle Eastern states. Material from the Washington Report on Middle East Affairs may be printed with out charge with attribution to the Washington Report on Middle East Affairs. Unsubscribe here.

# Exhibit B

- Blog
- About
- Discussion Guidelines

search in blog...

# Friday, April 11, Ambassador Afif Safieh

April 7, 2008 at 12:42 pm | In Coming Up |



On this edition of *Charlotte Talks with Mike Collins*, it's a conversation with Palestinian Ambassador to the U.S. Afif Safieh. He's in town to speak about the 60th Anniversary of Al Nakba, or the 1948 Palestinian Exodus. We'll talk about what that experience meant for his family and for Palestinians. Then we'll move to present time and explore the situation in Israel now, discuss U.S. / Arab relations, and more.

# No Comments yet »

RSS feed for comments on this post. TrackBack URI

# Leave a comment

Name (required)

Mail (will not be published) (required)

Website

Submit Comment

**XHTML:** <a href="" title=""> <abbr title=""> <acronym title=""> <b> <blockquote cite=""> <cite> <code> <del datetime=""> <em> <i> <q cite=""> <strike> <strong>

- # Bloggers

Wendy Herkey, Senior Producer, Charlotte Talks



## UA News

THE UNIVERSITY OF ARIZONA®

**April 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |

### calendar events

Today

This Week

This Month

Search Calendar

### useful links

Campus Map

Parking Maps

Building Index

add an event

# Lecture by Palestinian Diplomat Afif Safieh

Friday, March 28, 2008
7 p.m. - 8:30 p.m.

Afif Safieh, the Palestine Liberation Organization representative to the United States, will discuss "Negotiating the Future: A Palestinian Perspective on the Palestinian-Israeli Conflict."

This talk is presented by The University of Arizona Center for Middle Eastern Studies, the Tucson chapter of the American-Arab Anti Discrimination Committee and the UA political science department.

Safieh is a Palestinian diplomat and was appointed to his current position in 2005 following completion of a 15-year stint as the Palestinian representative to the United Kingdom and the Vatican.

Audience: All, Large (101-500)

| Where | Contact Info & Links |
|-------|----------------------|
| Social Sciences<br>Room: 100 | Angela Seidler<br>Center for Middle Eastern Studies<br>520-621-5450<br>mideast@email.arizona.edu<br>http://www.cmes.arizona.edu/events/ |

### calendar categories

> academic calendar/holidays
> athletics (men and women)
> ceremonies
> charity events
> community events
> conferences
> doctoral oral defense
> exhibits
> films
> health/medical
> meetings
> performances
> professional development
> recreation
> special events
> student events
> studies/call for participants
> talks
> tours
> workshops/training programs
> youth programs
> other

---

Office of University Communications     888 N. Euclid Ave. Room 413, Tucson, Arizona 85721

© 2007 Arizona Board of Regents

P.L.O. Mission to the U.S. - Articles by Chief Representative Afif Safieh - Safieh on Pres...    Page 2 of 6

World: 'Delaying the inevitable'

Page 1 of 5

NATIONAL
CATHOLIC **REPORTER**
NCRonline.org

World | This week's stories | Home Page

Issue Date: January 19, 2007



Palestinians walk in fenced lanes beside the 30-foot-high Israeli security wall at the entrance to Bethlehem in the West Bank Dec. 19.

**'Delaying the inevitable'**

*PLO ambassador says U.S. works against its interests in Mideast*

By CLAIRE SCHAEFFER-DUFFY
*Washington*

Afif Safieh is head of the PLO mission to the United States. The Israeli daily *Haaretz* once described Safieh, who speaks three languages fluently, as the "most articulate Palestinian diplomat in Europe and possibly the world." A Catholic born in Jerusalem and educated in Catholic schools, the 56-year-old Safieh earned degrees in political science at universities in Belgium and France. Prior to his posting to the United States in October 2005, he served as PLO representative to the United Nations, the Netherlands, and more recently as Palestinian general delegate to the United Kingdom and the Holy See.

Safieh works on the second floor of an innocuous brick building in downtown Washington. No flag or national emblem marks the entryway to the mission, which is not even listed on the building's directory in the lobby.

*NCR* interviewed Safieh in his office at the close of 2006.

**NCR: You have been a part of the Palestinian national movement since its inception. What is your overview of how the quest for statehood is going?**

*Safieh:* Today I believe there is an international consensus that requires a two-state solution as a way out of this vicious cycle of violence that has plagued the region and the world since 1948 onward. I believe today that the moral dilemma and the political challenge in the Middle East is the following: There is either one people too many -- this time we, the Palestinians -- or there is a missing state that needs to be created. I believe the verdict of the international community was that there is a missing state that needs to be created, yet the verdict of history is still undecided. I always invite my interlocutors to help history make the right choice.

**You say there is an international consensus for a two-state solution to the Israeli-Palestinian conflict but on the ground there has been no movement toward that solution. Do you despair that Palestinians will remain caught in this contradiction?**

It's true there is sort of a liturgy of diplomacy that speaks of a two-state solution yet on the ground there is what I call static diplomacy -- a lot of agitation but no real movement. During the last 15 years, we have had, unfortunately, a durable peace process rather than a permanent peace, which was the symptom of its failure. I keep telling my Israeli interlocutors that a territory that was occupied in six days can also be evacuated in six days so that the Israelis can rest on the seventh and we can engage in the fascinating journey of nation-building and economic recovery. It was up to now the political willingness that has been lacking.

I for one am disturbed, and as a diplomat I am angry because recurrent conflagrations are usually a failure of diplomacy and of diplomats. The best definition I have heard for democracy in the Middle East was by an enlightened Zionist leader, Nachum Goldman, who was commenting on Kissinger's shuttle diplomacy in the mid-'70s. Goldman said something which I believe is still relevant and pertinent now in the year 2006. He said, "It seems to me that diplomacy in the Middle East is the art of delaying the inevitable as long as possible."

http://ncronline.org/NCR_Online/archives2/2007a/011907/011907f.php

1/18/2007

Latest Daily Report from the
Palestine Monitoring Group (opens
a .pdf file)

**Join Our Mailing
List:**

Enter Your Email...

Subscribe

**Audio Controls**

Select a track below
or Click Here
for the Standalone Player

Awaiting...

Music courtesy of
The Edward Said National
Conservatory of Music

Page 2 of 5

### World 'Delaying the inevitable'

It is a painfully accurate definition that remains valid today. My belief has always been that, on the contrary, diplomacy in the Middle East should be the search and the quest for historical shortcuts so we can spare populations, societies the agonies of war and torment and injustices perpetrated. Yet today, I believe there are several factors that give rise to a realistic optimism. I believe decision-makers are starting to realize that allowing the status-quo to continue is a recipe for strengthening extremist movements in the region, while giving renewed believability and credibility to the diplomatic avenue is the best way to enhance and improve America's image around the world. Many believe that the unresolved Palestinian problem is what has poisoned international relations and that the perceived American alignment with Israeli preference and American complacency with Israeli territorial appetite are what have put America on a collision course with much of the Arab and Muslim world. Today we Arabs, from Morocco to Muscat, Oman, we have become unreasonably reasonable. We offered the Israelis a historical compromise through the Arab Peace Initiative that stipulates that if Israel withdraws out of its 1967 expansion, we are ready to recognize Israel in its pre-'67 existence.



Afif Safieh, head of the Palestine Liberation Organization mission to the United States

### Is that true for Hamas?

I'm coming to that. This [the Arab Peace Initiative] shows that peace is not only desirable but is also possible. My personal belief is that America is committed to Israel's existence but America is not necessarily committed to Israel's expansion. Today Israel's existence is no more questioned or challenged. It is its expansion that is challenged -- the wisdom of keeping the hilltops of the West Bank. But what is America's interest in keeping the hilltops of the West Bank? None. So I believe today we are witnessing an attempt at reassessing American foreign policy in the Middle East. There is a saying here that is frequently invoked -- that Israel is the only friend America had in the Middle East before Israel. But America had no enemies in the Middle East before Israel. I think a soul-searching exercise is long overdue. My message has been since I arrived a year ago the following: We are not inviting America to sacrifice a traditional friend Israel. We are offering America no additional one -- Palestine.

### Do you think American leaders are beginning to recognize that resolution of the Israeli-Palestinian conflict is crucial to regional peace? It seems for the past three years it has been on the back burner.

The pro-Israeli lobby in Washington has constantly tried to convince American decision-makers of the marginality of the Palestinian problem, while all other actors in the international community from Paris to Pakistan were telling the administration for years that the Palestinian issue is central to the region and to international relations. I believe that the administration is increasingly aware of that fact. In my dealings with senior officials of the administration, I have often expressed my amazement at what I call the self-inflicted impotence of the only remaining superpower as far as Israel-Palestine is concerned.

I believe that today in the unipolar, monopolar system, non-alignment should be what characterizes American foreign policy. And that for two reasons. In a unipolar, monopolar world, if America aligns itself with one belligerent actor in a regional conflict not only does it antagonize, offend and alienate all the [other] regional players in that conflict, but it also antagonizes, offends alienates and even ghettoizes a domestic component of your own social, national fabric.

### And by that you are referring to Arab-Americans?

People should be aware that it must not have been easy to be a Palestinian-American (400,000), an Arab-American (4 million) or a Muslim American (8 million) because of this disturbing feeling that your country of adoption is insensitive to the suffering of your country of origin. I for one hope for American evenhandedness and nonalignment, and I believe there is a majority within this society in favor of that attitude. During the Lebanese conflagration during the summer, an opinion poll, scientifically conducted, showed that 60 percent of American public opinion was in favor of American diplomatic evenhandedness between Israel and Lebanon. It's interesting how society and public opinion can have more mature reactions than the political establishment.

### What's your sense of the recent truce between Israeli forces and Palestinian militants in Gaza?

I'm extremely happy that truce has been concluded. We have been calling for it for a long time.

When you say "we," whom do you mean?
We the Palestinian society. I believe for it to hold it needs to be

World: 'Delaying the inevitable'

Page 3 of 5



Palestinian gunmen exchange fire with Hamas
security forces in the Gaza Strip Oct. 2. Rival
Palestinian forces exchanged fire, residents said,
despite appeals for calm from President Mahmoud
Abbas of Fatah and Prime Minister Ismail Haniyeh
of Hamas.

extended to the West Bank where the Israelis have not shown at all any
self-restraint and have continued with political assassinations and
arrests. It would be sad if Israelis' continued misbehavior in the West
Bank were to be the termination of the truce that was achieved between
Israel and the Gaza region. I personally believe two other steps need to
be taken and could be taken in a matter of days. And those two other
steps, in addition to the truce and the cessation of hostilities, can alter
dramatically, constructively, positively the political environment in
which we operate. Those two additional steps are the following: One,
the freedom of movement of people and products within the West Bank
and between Gaza and the West Bank. Today the West Bank is plagued
with 650 unnecessary checkpoints that are totally suffocating the
society and strangulating the economy. Our society loses almost 8
million working hours a day in unnecessary delays, humiliating delays
at those checkpoints. The notion of a safe passage was already there in
the Oslo Agreement of 1993, reconfirmed in what is called the
Condoleezza Rice Agreement in November 2005, yet never seriously

implemented by the Israelis. That freedom of movement of people and product will be extremely beneficial to the
declining Palestinian economy and would be the equivalent of an injection of more than a billion dollars into that
economy without pumping any new money.

The second step that needs to be taken -- and we are aware it is connected with the release of the captive Israeli soldier
-- is the need for a massive release of Palestinian political prisoners. Around 10,000 Palestinians today are in Israeli
jails, which means that every city, village, refugee camp, extended family in Palestine has one or more members behind
bars. And a massive release of prisoners -- beyond what Mr. Olmert is contemplating -- is not only a desirable decision
but pragmatically it will have profound and positive shock in Palestinian society in favor of renewed hope, giving new
believability and respectability to the peace process we hope to trigger again.

The Israeli position would argue checkpoints have been imposed and arrests made because of the Quassam
rockets and suicide bombers. I wonder if you could comment on the rise of Palestinian militancy and how it
could be impeding the peace process. What do you think about that, particularly the suicide bombing?
I personally and President Mahmoud Abbas have condemned every suicide bombing that has occurred. People should
not be under the impression that suicide bombings are a daily occurrence. In 2006 -- and we are at the end of 2006 --
there was only one suicide bombing, only one. That is because of a Palestinian decision. While Israel targeted and
untargeted, Israeli incursions, Israeli bombardments were a daily occurrence, where we have on average of four
Palestinians killed every day. I for one have the following moral position: Whoever does not condemn Israeli
bombardments, incursions and killings is not morally qualified to have an opinion on suicide bombings.

I just came back from the Occupied Territories. I was in the West Bank for three weeks, and I tested those checkpoints.
In my opinion they are of no security value and each one of them is physically by-passable. They are there to make life
miserable for Palestinians. They are there to humiliate, to oppress to harass the Palestinian population. They are there to
drive us into a process that an American Jewish economist has called the process of de-development of Palestine,
meaning the Israelis' deliberate policy of plunging us into economic decline. This policy has been unfortunately
successful because it has been allowed to take place. Those checkpoints are of no military value. I have checked it with
a driver on several days in several areas.

In addition to an external conflict, Palestinians are facing an internal crisis -- the division between Fatah and
Hamas. I'm curious. Who gives you your marching orders?
My conscience. Like in any other political system, ambassadors are the personal envoys of their presidents. Palestinian
society is passing through an interesting moment in our political domestic history. We have what the French have
called in their constitutional life cohabitation, meaning that two elections that were not synchronized in time produced
two different majorities. In the presidential election of January 2005, Mahmoud Abbas, leader of Fatah, was elected
with a very comfortable majority of 63 percent on a very inaugural political program. An immaculate competitive
election, internationally monitored. In January 2006 in an equally immaculate election, internationally monitored,
competitive, Hamas won those elections with around 44 percent of the votes, yet their parliamentary representation was
magnified because of the electoral system we have.

http://ncronline.org/NCR_Online/archives2/2007a/011907/011907l.php

1/18/2007

World: 'Delaying the inevitable'                                    Page 4 of 5

I would like to say that the reaction of the American administration and as a result of the Quartet, which often looks like a Quartet, after our elections of January 2006 was not wise and was precipitous. I always say the "D" letter can mean three different things. It can mean democracy and it is we the Palestinians, the Arabs who believe and need democracy as a right and a duty toward ourselves. But for others, it means destiny and for the Israeli political establishment I have suspicion that when they speak of democratization they really mean destabilization of the Middle East

My message, after our elections, to the administration was the following: I said, "We now have two possible scenarios, or two possible sets of choices. We either trigger a credible peace process with the emphasis on the word credible because we have had some farcical peace processes, hoping to engage a majority within Hamas -- and I believe there is a pragmatic majority within Hamas -- or we can try to rob them of their legitimate electoral victory, pushing Hamas back to militant and military options. Unfortunately, it was the second scenario which was adopted.

**Will you comment on the recent outbreak of armed conflict between Hamas and Fatah. Do you think there is any hope for a unity government?**
Both movements, Hamas and Fatah, will be well inspired to listen to Palestinian public opinion, which is totally opposed to internal fighting. A government of national unity is the wisest course of action and does not need protracted negotiations. Any movement perceived as obstructing such an outcome will suffer a dramatic loss of popularity.

**Has the Hamas victory affected the status of Palestinian Christians?**
No. Up to now they [Hamas] were extremely respectful of Palestinian Christians. They are more aware than anyone that their victory was with a 44 percent majority and they don't have a mandate to change the fabric of Palestinian society or simply change Palestinian culture.

I always consider Hamas to be a part of Palestinian culture and believe Palestinians are firmly behind the pluralistic nature of our society. Hamas is aware of that and they have acted on this level with great prudence. Christians have nothing to worry about within Palestinian society. They are well represented within the political system, be it at the municipal, parliamentary or ministerial level or diplomatic service. Out of 90 ambassadors, eight are Christians, occupying positions in Washington, London and Paris, which are not minor postings.

**Can you comment on the recent talks between Israeli Prime Minister Ehud Olmert and Egyptian President Hosni Mubarak concerning Israeli-Palestinian peace negotiations?**
There was an Olmert-Mahmoud Abbas meeting which gave rise to a much-needed optimism and hope. During that meeting, it was agreed that Israel will reduce the number of military checkpoints to improve significantly the quality of life under occupation; that Israel will release a number of prisoners on the occasion of the Muslim feast of Eid-al-Adha as a gesture of goodwill and that Israel will transfer $100 million out of the $700 million dollars accumulated from our tax money they collect on our behalf. Not only were none of the above implemented, but Israel continued with their military escalation to the extent that they undertook a major military incursion in Ramallah which resulted in four Palestinians killed and dozens wounded the day Olmert was supposed to visit President Mubarak in Egypt to discuss ways to reactivate the peace process. The Israeli spokespersons now admit that this attack on Ramallah was a blunder. Anyway, it was the reason for the failure of the Israeli-Egyptian summit. There are reasons to believe that the Israeli army does not necessarily always operate on the instructions of the political authorities.

Some analysts say the Middle East is embroiled in a conflict between the secularist, moderate "democracy-lovers" and political Islam. Does that assessment accurately describe divisions among Palestinians?
I personally believe that this is an oversimplified approach to the complex realities of the Middle East. I believed for a long time that some in the [Bush] administration would have been wise to enrich their political diplomatic vocabulary with the word "occupation" so that they can understand the complexities of feelings in the region. Some saw it under the distorting prism of the clash of civilizations, of the need to contain and crush Islamic revivalism. Some saw it as a need for democratizing the region. I personally believe that all this was tailor-made to avoid addressing the territorial, geographic, national question of the Palestinians. I believe since the Arab world and since the Arab regional system has been available for a historical compromise, Israeli intransigence and non-reciprocity have been for the last 20 years defying, delegitimizing and destabilizing a profoundly pro-Western regional system.

Israeli intransigence has destabilized a pro-Western region?
Belies, destabilizes and delegitimizes a profoundly conservative and pro-Western regional system because they [pro-

World: 'Delaying the inevitable'                                                  Page 5 of 5

[Western Arab leaders] cannot deliver on their promises. They have adopted what I call an unreasonably reasonable approach, yet cannot obtain results. The fact that they don't obtain results diminishes their legitimacy and puts at risk their stability by increasing the appeal of extremist organizations. And then America has to employ its power for damage control. This is why I am in favor of preventive diplomacy rather than questionable curative measures and I believe even security risks should have political responses. I believe in the primacy of politics. The unresolved nature of the Palestinian problem is what has plagued international relations and put America on an unnecessary collision course with the Arab world because it was seen as shocking Israeli expansionism and Israeli misbehavior.

**Is the United States still a legitimate broker for the Israeli-Palestinian conflict?**

The United States is an indispensable player in the Middle East and elsewhere in the world. I am a realist and I personally believe there will be no successful peace process without the engagement of the American administration, and I would go even further, without the personal involvement of the president and the secretary of state. We welcome that involvement and that engagement. I remain an optimist that the last two years of President Bush can be productive, fruitful and that we will put again the process on track, making it irreversible. I believe it is only optimists who make history, not the pessimists.

**What's your take on the Vatican's contribution to resolving the Israeli-Palestinian conflict. Does the Vatican have any role to play?**

I have been privileged to have been the person who opened diplomatic channel of communication between the PLO and the Vatican. I have always believed that the relationship between the Palestinian people and the Vatican is the oldest in history since Christ. The first Christians and the first popes came from Palestine. The Vatican is an important voice in international relations. It can be seen as a big NGO [nongovernmental organization] or as a spiritual empire. We have always looked at the Vatican as a powerful moral voice in international relations. Pope John Paul II was the regular interlocutor for Yasser Arafat and the Palestinian leadership. We always made sure to consult with His Holiness at every crossroad. The Vatican has always shown enormous concern for the Israeli-Palestinian problem because mandatory Palestine happens to be the Holy Land, which has the major holy sites of Christianity -- Jerusalem, Bethlehem, Nazareth -- and has the oldest Christian community. I remember the first time I met him in 1980 -- His Holiness, John Paul II -- what my first sentence was: "Your Holiness, Palestine is our Poland." By showing interest in the Palestinian problem, the Vatican will reinforce its universal message and will no more be seen as a Eurocentric institution.

**That could be very valuable right now.**

Palestine always has its usage. I am sure I won't be discomfirmed by the Holy Spirit on that one. I have been affected by my Christian upbringing and my political vocabulary betrays that Christian upbringing. I am known on the lecturing circuit to often say that even in the bleakest of moments, I believe that Palestine will resurrect. As you know, We in Jerusalem have had some previous experience of Resurrection.

*Claire Schaeffer-Duffy is a longtime contributor to NCR*

National Catholic Reporter, January 19, 2007

| This Week's Stories | Home Page | Top of Page |

Copyright © The National Catholic Reporter Publishing Company, 115 E. Armour Blvd., Kansas City, MO 64111
All rights reserved
TEL: 1-816-531-0538    FAX: 1-816-968-2280    Send comments about this Web site to: webkeeper@natcath.org

1320 18th Street, suite # 200, Northwest, Washington, DC, 20036 | Telephone: (202) 974 6360 Fax: (202) 974 6278
plomission1@aol.com | Site designed by JMD | © 2006 P.L.O. Mission to the U.S. All Rights Reserved

**0 6 8 3 3**



BETA **Charlie rose**

SEARCH _____  ○ GUEST  [SEARCH]
                         ○ KEYWORD
                         ADVANCED SEARCH

HOME   SCHEDULE   VIDEO ARCHIVE   GUESTS   FEATURES   CHARLIE ROSE TOMORROW   TOPICS   THE SHOP

*"I believe that there is a place in the spectrum of television for really good conversation, if it is informed, spirited, soulful." Charlie Rose*

## Afif Safieh

### Related Videos



Show Date: 11/16/2006
**A conversation with Middle East expert Rashid Khalidi**
★★★★☆ 19 Votes
[BUY] [SHARE]  More Info..

Upcoming episodes in the Charlie Rose Science Series:
September 19 - Heart Disease
October 17 - Global Health

Click here to watch previous episodes of the Charlie Rose Science Series


The Coca-Cola Company
(a proud sponsor of Charlie Rose)

CANDIDATE MASHUP


**STEVE NASH**
In the Greenroom:
Web Exclusive

                                                05/24/2006
**Rashid Khalidi, Afif Safieh, David Makovsky**
A conversation about Ehud Olmert's visit to Washington with guest host Bob Simon

**Keywords:** Ehud Olmert, Ambassador Afif Safieh, Ariel Sharon, Washington Institute for Near East Policy, Prime Minister of Israel, PLO Rashid Khalidi, Bob Simon, Palestine, David Makovsky, Yasser Arafat, Israel

[BUY] [SHARE]  ★★★★☆ 2 Votes

On the occasion of Prime Minister of Israel Ehud Olmert's visit to Washington DC, guest host Bob Simon of CBS hosts a panel discussion including Ambassador Afif Safieh of the PLO mission in Washington, professor Rashid Khalidi of Columbia University and David Makovsky of the Washington Institute for Near East Policy.
0 comments | More Info...

Show Date: 3/28/2006
**A discussion about the elections in Israel with guest host Dennis Ross**
★★★★☆ 1 Votes
[BUY] [SHARE]  More Info..



### Charlie's Choice

**Dead Certain: The Presidency of George W. Bush** by Robert Draper
Buy it

## Biography



Afif Safieh

Afif Safieh is a Palestinian diplomat. He is currently the representative of the Palestine Liberation Organization to the United States, after serving fifteen years as Palestine's representative to the United Kingdom. He served as deputy director of the Palestine Liberation Organization Observer Mission to the United Nations Office at Geneva. He also worked as a staff member in Yasser Arafat's office in Beirut, in charge of European Affairs and UN institutions.

Safieh was a researcher at the Centre for European Studies in the Catholic University of Louvain. He served as PLO representative to the Netherlands, and was involved in the 1988 Stockholm negotiations that led to the first official and direct American-Palestinian dialogue.

Source - Wikipedia http://en.wikipedia.org/wiki/Afif_Safieh

### Associated Media

**amazon.com**  DVD
Charlie Rose DVDs on Amazon.

**audible.com**  Audio
Audio available through Audible.com.

**VOXANT**  Transcripts
Transcripts available through Voxant

**The Blair Years: The Alastair Campbell Diaries** by Alastair Campbell
Buy it

### Find Charlie in Your Area

Click here to check your local listings.

### Contribute

Show ideas? Email the producers here.

### Charlie Responds (FAQ)

Submit your questions for Charlie and read Charlie Responds (FAQ) for the answers

Afif Safieh - Charlie Rose

**Click here to
sign up for our
email updates**

**Charlie's Updates**



**Welcome!**
Tue. Apr 24
It is my pleasure to welcome you to
our new website,
www.charlierose.com. I hope you
enjoy this unique experience in the
merging of television and the Internet.

The efforts that have gone i . More...

Palestine NATO Al Gore
Newt Gingrich Bill Clinton
Bob Dole Books Bosnia
Broadway Bush
Bush administration Business
Newsweek China
Clinton Administration
Colin Powell
George W. Bush
Hillary Clinton Iran Iraq
Israel John Kerry Kosovo
Microsoft Middle East

View All...

Charlie Rose - Schedule
Charlie Rose - Features
Charlie Rose - Recent Videos
Charlie Rose - Recent Comments

Contact Us | About the Show | Biography | © Charlie Rose Inc. -- All Right Reserved 2006 |
SITE BY CODE AND THEORY



### Ambassador Afif Safieh

### Fatah and Hamas Agree on Unity Government:

### Will the unified ranks bring the shores of peace to the Middle East?

The biggest event of the 2007 year took place on March 12 with the Representative to the Palestinian Authority, Afif Safieh, bringing in crowds of over 130 guests to the Marriott Hotel – Del Mar. The Ambassadorial Roundtable featured a packed banquet hall, full of energy and anticipation for what was a highly-eloquent, vibrant and humorous speech by Ambassador Safieh.

Ambassador Safieh engaged all the San Diego World Affairs Council members and guests from the edge of their seat in his energetic and well-practiced address. He discussed the state of daily life and commerce in the Middle East under current controls imposed by the Israeli government. His example was that one Coca-Cola van attempting to transport its cargo would spend a full day going through numerous checkpoints of having to unload it materials for inspection.

His vision for a future Palestinian state was relentless and firm. He said that the heart of the current conflict over territory was that Israel is delaying and postponing an inevitable truth, that Palestine will one day have its own state. Until then, there would be continued lack of resolution, with increased pressure from the international community and allies of Palestine joining the effort.

With reference to the United States' support of Israel, he made a witty comment that drew laughs from the crowd: he stated that the U.S.'s support of Israel is certainly an advantageous backing, in light of the U.S. being a dominant player in global affairs, but yet in terms of Israel becoming the 51 American state, why would they settle for 2 senator when they currently enjoy 50?!

He also made diplomatic references to France as a role model, and using France's foreign policy as an inspiring approach. He even inserted some intellectual referencing and anecdotes in the French language. Afif Safieh afterall attended French school in Jerusalem as a child, followed by earning his degree in Political Science in Belgium and then again at the Paris Institute of Political Studies.

His optimism and belief in justice in the Middle East came with the prospect for peace. Safieh demonstrated a charming aura of acceptance along with his frequent witty word-plays (such as European nations "having a role but seeking an actor," and the tensions in international policy when governments "get aid and advice but take the aid and won't accept the advice").

Guests at the end of the event asked poignant questions from all perspectives of

SDWAC - Mission Statement







1250 Sixth Ave. Suite 110 - San Diego, CA 92101 - tel. 619.325.8200
Copyright © 2005 SDWAC. All rights reserved.
Last revision 05/19/06

SDWAC - Mission Statement

the Israeli-Palestinian conflict. As the evening concluded, the atmosphere was overwhelmingly one of success with guests appreciating Afif's Safieh's insights and visions for the future roadmap in the Middle East.



 

 

 



◄ home    📻 radio programs a-z

browse by topic

[select a topic ▼]

  
radio    tv    news

programs a-z

- all programs
- radio
  ▪ Forum
    ○ audio archive
    ○ about
    ○ California Reading
- tv
- arts & literature
- education & learning
- history & culture
- home & how-to
- kids & family
- local focus
- news & public affairs
- science & nature
- radio FAQ
- tv FAQ


support KQED
⊙ pledge online

help us help you

➤ about KQED
➤ support KQED
➤ the guide online
➤ email newsletters
➤ KQED store
➤ help & FAQ
➤ contact info

## Forum: Archive


forum
WITH MICHAEL KRASNY




sponsored by
San Mateo County Needs
(Cu) Foster Parents
650-802-7651
www.smcfosa.org

Thu, Jul 27, 2006 -- 10:00 AM

**Palestinian Ambassador Afif Safieh**
🔊 Listen (RealMedia stream)
🔊 Download (MP3)
    (Windows: right-click and choose "Save Target As." Mac: hold Ctrl,
    click link, and choose "Save As.")

Join Michael Krasny in conversation with the Representative of the
Palestinian National Authority to the United States, Afif Safieh.

Host: Michael Krasny

**Guests:**
- Afif Safieh, Representative of the Palestinian National Authority to the
  United States, former Palestinian general delegate to the United
  Kingdom, and former Palestinian Representative to the Netherlands

back to week of July 27, 2006

### email this page to a friend

\*Your name:  [                    ]

\*Your email address:  [                    ]

\*Friend's email address:  [                    ]

Additional Message:  [                    ]
(optional)


send

\* Indicates required field. Names and email addresses are not
collected by KQED.org. For more information, please see our privacy
policy.

download your
copy of KQED's
TheGuide
the member magazine
formerly Fine Tuning

archive search

# PLO Mission to the United States

Palestine Liberation Organizaton (PLO) - The Official Voice of Palestine in Washington

## Welcome Letter from Afif Safieh

Ahlan wa Sahalan

It is with great pleasure that I welcome you to the PLO Mission website in the United States of America. The purpose of this site is to offer accurate and up-to-date information on issues of concern to Palestinians in Palestine and abroad. We also hope that it will be a tool in promoting cooperation and understanding between the citizens of the United States of America and Palestine.

Palestine and the United States of America share common universal values and beliefs concerning the spread of freedom and democracy throughout the world. Palestinians have long sought to be free from occupation. President Mahmoud Abbas and his government are committed to a Middle East where the roots and causes of extremism will be eradicated and the seeds of liberation, progress and democracy will be empowered.

I have been honored to represent my government to the American people. Since my posting in 2005, I have traveled the nation and have been humbled by the outpouring of support on a grass roots level for peace in the Middle East.

Strengthening U.S. – Palestinian bilateral relations is a central objective of the Mission. We are working to broaden our outreach among the public and U.S. government officials, as a way to improve advocacy efforts regarding the Palestinian quest for peace and independence.

The PLO team in Washington is actively working to ensure that the website is offering helpful information. We welcome your input and want to hear your ideas about ways we can improve our online resources.

May the journey begin!

Sincerely yours,

Afif Safieh
Head of the PLO Mission to the United States of America

Copyright © 2008 PLO Mission, Washington, DC



The Official Voice of

Palestine in Washington





HOME | CONSULAR AFFAIRS | AFIF SAFIEH | SAFIEH'S ARTICLES | MULTIMEDIA | ARTICLES | LINI

# Afif Safieh

**Biographical Information:**



- Afif Safieh was born in Jerusalem in 1950.

- Studied in Jerusalem at the "College des Frères".

- In 1972, he obtained his 'Licence' in Political Science and International Relations from the Catholic University of Louvain, Belgium.

- In 1974, he finished his 'Cycle Superieur (3eme cycle) en Sciences Politiques' from the Fondation Nationale des Sciences Politiques, Paris.

- He was President of the Belgian section of the General Union of Palestinian Students from 1969 until 1971, then President of the French branch in 1974-1975.

- From 1976 until 1978, he was Deputy Director of the Palestine Liberation Organisation Observer Mission to the United Nations, Geneva.

- From 1978 until 1981, he was staff member in President Arafat's office in Beirut, in charge of European Affairs and UN Institutions.

- From 1981 until 1985, he was a researcher at the Centre for European Studies in the Catholic University of Louvain, Belgium.

- Between 1985 and 1987, he was a visiting scholar at the Centre for International Affairs, Harvard University.

- From 1987 until 1990, he was PLO representative to the Netherlands.

- He was involved in November-December 1988 in the Stockholm negotiations that led to the official and direct American-Palestinian dialogue.

- He was nominated, Palestinian General Delegate to the United Kingdom in

## Links

**Afif Safieh**

Articles
Biography
Audio / Video

Message Board
Contact Us

---

## Latest News:

Actor Emma Thompson
Bids for Palestinian Righ
Coalition in Support of
Ending Israel's Occupatio
Set for Launch

P.L.O. Mission to the U.S. - Head of Mission Afif Safieh#bio#bio                                    Page 2 of 2

September 1990.

- In January 1995, he was invited to become a member of the International Board of Trustees of Bethlehem University, the Vatican-sponsored University in Palestine.

- Nominated Palestinian General Delegate to the Holy See, he presented his letter of credentials to His Holiness Pope John II on November 6, 1995.

- In November 2005, he assumed his duty as Head of the PLO Mission in Washington.

- Compilations of his articles have appeared in two books:
    - 'Self determination', published by Al-Fajr printing press, Jerusalem, 1986 (jointly with his wife Christ'l Leclercq).
    - 'One people Too Many?' published in the Hague in 1987.

- ... and 3 booklets:
    - Children of a Lesser God?
    - The end of pre-history
    - On Palestinian Diplomacy, published by the Palestinian General Delegation to the United Kingdom.
    - In search of Palestinian Identity, published by Passia, 2005

- He is married and has two girls: Diana and Randa

Gambari: World cannot Afford another Year like 2006 in Middle East

UNHCR: More Palestini Fleeing Baghdad Arrive Syrian Border

Latest Daily Report from the Palestine Monitoring Group (op a .pdf file)

**Join Our Mailing List:**

Enter Your Email...

Subscribe

**Audio Controls**

Select a track below or Click Here for the Standalone Player

Awaiting...

Bawa el khavateri

Music courtesy of The Edward Said National Conservatory of Music

1320 18th Street, suite # 200, Northwest, Washington, DC, 20036 | Telephone: (202) 974 6360 Fax: (202) 974 6278
plomission1@aol.com | Site designed by JMD | © 2006 P.L.O. Mission to the U.S. All Rights Reserved

06859

Exhibit C

Global Citizens Circle




HOME     ABOUT US     PROGRAMS     JOIN     CONTACT     LINKS

## Peace Building In The Middle East

June 6, 2000 • Omni Parker House, Boston

Co-Host

**The World Affairs Council of Boston**

Discussion Leaders



**Itzhak Levanon**, consul general of
Israel to New England

Mr. Itzhak Levanon first entered the
field of public service in Jerusalem in
1969. His involvement in trying to
create a rapprochement between
different groups in the city just after
the Six Day War and the reunification
of Jerusalem lead him to establish contacts with Israeli's Foreign Service. He
joined the Ministry of Foreign Affairs four years later and represented the Israel
Mission to the United Nations in New York City. He subsequently became the
political Counselor If the Embassy of Israel in France, the Counsel General in
Montreal and was a member of the Israeli delegation to the peace talks in
Washington D.C. He has served as Consul General to Israel of New England
since his appointment in 1997.

"We have some creative and functional ideas how Jerusalem can remain united,
one city, the capital of Israel, and that all religions will have freedom of worship
and free access to the city." --Itzhak Levanon

---

**Hasan Abdel Rahman**, chief representative of the PLO and the PNA in the
United States

Mr.Hasan Abdel Rahman has headed the Palestinian Mission in the United
States as Chief Representative of the Palestinian Liberation Organization (PLO)



James Carroll, Hasan Abdel Rahman

and Palestine National Authority since 1994, Prior to his appointment, he served as Chief of the Palestine Mission in Canada and Senior Political Advisor to the Palestinian Delegation to the Madrid Peace Conference and the peace talks in Washington D.C. A frequent guest on television news programs, Mr. Adel Rahman has given several presentations on Palestinian issues and the Israeli - Arab conflict at universities and organizations in the U.S. and abroad.

"I hope and pray to God that our children will not be involved in violence and that they will grow up as real children, but we have to give them that opportunity. And it is not only the responsibility of the Palestinians alone, but also of Israel. And together we can do that." --Hasan Abdel Rahman

### Moderator

**James Carroll**, author and columnist, Boston Globe

Mr. James Carroll has moderated a past Circle at which Gerry Adams spoke on his first U.S. trip after the 1994 Peace Process in Northern Ireland was announced. He has been a civil rights activist, antiwar demonstrator, and a former Catholic priest. He is author of none novels and a memoir, An American Requiem won the National Book Award in 1996. His newest book Constantine Sword: The Church and The Jews will be published in January.

---

by James Carroll

On June 6, 2000, the Global Citizens Circle community convened at the Parker House to participate in a lively - at times passionate - discussion of issues at play in the Middle East peace process. The evening's speakers were Itzhak Levanon, the consul general of Israel to New England, and Hassan Abdel Rahman, chief U.S. representative of the PLO and the Palestine National Authority.

As would become clear at Camp David only a few summer weeks later, the main obstacles to a final peace agreement between Israel and the Palestinians involved the future of Palestinian refugees, the borders of the proposed Palestinian state, and the status of Jerusalem. All three issues were directly faced in the conversation, and so were the ways in which each question can seem impossible to resolve. Mr. Abdel Rahman, for example, was emphatic in stating the Palestinian claim to complete and full political control over East Jerusalem, the section of the city that fell under Israeli control during the Six

Global Citizens Circle                                                    Page 3 of 3

Day War in 1967. Equally firm was Mr. Levanon's assertion of Israeli
sovereignty over an undivided Jerusalem. Some in the Global Citizens Circle
audience wondered if such adamant staking of claims represented the kind of
positioning to be expected at the outset of negotiations, while others expressed
pessimism about the prospects for compromise that the entire peace process
presumes.

In the end, the Global Citizens discussion was a kind of forecast of the
difficulties that would confront the Camp David negotiators. But also, this
direct, honest, and civil discussion of the gravest questions facing Israelis and
Palestinians offered an example of the courage and hope that keeps the Middle
East Peace Process going even now.

For more information on this topic:

    World Affairs Council of Boston

    World Affairs Councils of America

    Palestine National Authority

    New England Israel Consulate General

    American Jewish Committee

Global Citizens Circle • 230 Commerce Way, Suite 300 • Portsmouth, NH 03801 USA • Globalcitizenscircle@comcast.net



**Online NewsHour**

NEWSHOUR WITH JIM LEHRER TRANSCRIPT
ONLINE FOCUS

# THE PALESTINIAN VIEW

March 29, 2002

Hasan Rahman, chief Washington representative for the Palestinian Authority, discusses the Israeli takeover of his organization's headquarters.
Background report

> Click here to watch this segment in streaming video

> Click here to listen to this segment in RealAudio

NewsHour Links

*Online Specials:*
Israeli-Palestinian conflict

The U.S. War on Terrorism

Saudi Arabia: Into the Kingdom

*March 29, 2002:*
Secretary of State Colin Powell condemns suicide attacks and encourages Israeli restraint.

*March 29, 2002:*
Israeli tanks storm Yasser Arafat's compound in Ramallah.

*March 28, 2002:*
The Arab League endorses the Saudi peace plan.

*March 27, 2002:*
Arab Summit Prospects

*March 26, 2002:*
Serge Schmemann, *New York Times* correspondent in Jerusalem

*March 21, 2002:*
The *New York Times* Jerusalem Bureau Chief

MARGARET WARNER: With me is Hasan Abdel Rahman, the Palestine National Authority's chief representative to Washington. Mr. Rahman, I understand you've spoken to Yasser Arafat in the last hour or so. What did he say?



HASAN ABDEL RAHMAN: Well, he's in a very good and high morale. He believes that he is the fighter for the cause of the Palestinian people. He realizes that there is an aggression committed or being committed by Israel against him personally, and against all of the Palestinian people; he is one of the Palestinian people -- those 3.4 million Palestinians who live under one of the most brutal military occupations in history.

## Arafat's condition

MARGARET WARNER: Give us a sense of where he is. I understand this compound is about a city block big and he is in one particular building. Is he still in this windowless office that he was described as being in earlier today?

HASAN ABDEL RAHMAN: Believe me, I did not talk to him about where he is. We spoke about other issues. But he informed me of his high morale and of his attempts to speak to other leaders around the world. He is being contacted by many people at this moment, by the Europeans, by Arab leaders, by Palestinian leaders, to give support and express their condemnation of Israeli attack against him and against Ramallah and the Palestinian people.

MARGARET WARNER: Secretary Powell said, as you know, that Ariel



> When you use cannons and tanks to attack a civilian compound, you can kill somebody by accident.
>
> HASAN ABDEL RAHMAN,
> Chief Washington
> Representative, PLO



James Bennet
March 19, 2002:
Making Martyrs

March 14, 2002:
Escalating
Violence

March 14, 2002:
Israeli and
Palestinian Public
Opinion

March 11, 2002:
Newsmaker:
Condoleezza Rice

March 5, 2002:
A Saudi peace plan
appears to be
gaining support

Feb. 21, 2002:
Some perspective
on the escalating
violence between
Israel and
Palestinians.

Feb. 20, 2002:
New York Times
foreign affairs
columnist Tom
Friedman
discusses his
recent trip to Saudi
Arabia.

Browse the
NewsHour's
coverage of
terrorism and
Middle East.

Outside Links
Embassy of Israel

Palestinian
National Authority

The Israeli
Ministry of
Foreign Affairs

The U.S. State
Department

Sharon assured him that Mr. Arafat is not a target either to be killed or to be expelled. Does Mr. Arafat still feel he is a target?

HASAN ABDEL RAHMAN: With all due respect to Secretary Colin Powell, I don't see how can he believe, first of all, or trust Mr. Sharon. We remember all what happened in 1982 -- how Mr. Sharon lied to his prime minister and to the Israeli cabinet and he was reprimanded for that. Mr. Sharon is a liar. He cannot be trusted.

MARGARET WARNER: I guess what I'm asking –

HASAN ABDEL RAHMAN: And let me just continue because when you use cannons and tanks to attack a civilian compound, you can kill somebody by accident.

MARGARET WARNER: I see. So the fact that they-- if they really wanted to kill Arafat, they already could have, could they not?

HASAN ABDEL RAHMAN: The operation is not over yet. As I was talking to President Arafat, Israeli tanks were firing on his compound. What is there in Arafat's compound to use so many tanks to attack it? I mean I was honestly disappointed with the statement made by Colin Powell because we respect Mr. Colin Powell. But I wonder how he allows even himself to accept that the elected leader of another people be attacked by the army of an occupying nation without outrage from the United States and from Mr. Colin Powell personally.

## Isolating Arafat

MARGARET WARNER: Sharon said himself that he wanted to isolate Mr. Arafat. What do you take that to mean, and has he succeeded in further weakening Mr. Arafat's hold, essentially, on the Palestinian National Authority, on Palestinian security forces, or is Arafat still in charge?

 HASAN ABDEL RAHMAN: This is an outrageous statement, Margaret. How would even I consider what Mr. Sharon says, to isolate Mr. Arafat? Yasser Arafat is the elected leader of the Palestinian people. He is respected, recognized by 180 nations around the world. What right does Mr. Sharon, who made a career of being a terrorist, have to isolate Mr. Yasser Arafat? That should be the question. And I am amazed that there is not enough outrage against this action,

We have condemned [terrorism]. We have tried to contain it, but you cannot isolate what happens from the overall context that is created by Israel.

HASAN ABDEL RAHMAN, Chief Washington Representative, PLO

reckless action by Sharon, dangerous action, which puts not only the future of peace between the Palestinians and the Israelis in danger, but the whole stability of the region.

MARGARET WARNER: All right. Let's talk about terrorism because you brought that up and Sharon of course, brought that up today saying as he said before, that Arafat runs a coalition of terror, that they're going in to root out this infrastructure. Are you saying that even though some of the groups that have done some of these attacks such as the al-Aqsa Brigades are tied to Fatah, PLO's military wing, that Arafat has no control, no ability to rein in any of the attacks?

HASAN ABDEL RAHMAN: Margaret, you and I know that terrorism was introduced to our region by no other than the Israeli leaders. You remember that two of the Israelis first prime ministers, Menachem Begin and Yitzhak Shamir, were both wanted by the British for assassination of the international mediator. So we know who introduced terrorism to the region. Now there are certain Palestinians who are involved in acts of violence that we reject, but there is a difference between having one individual Palestinian acting violently and when terrorism becomes the policy of the state of Israel.

## Curbing terrorism

MARGARET WARNER: Are you saying, though, that terrorism is in no way the policy of the Palestinians?

HASAN ABDEL RAHMAN: Absolutely not. On the contrary, we have condemned. We have tried to contain it, but you cannot isolate what happens from the overall context that is created by Israel. Remember that for 35 years, the Palestinian people are living under the most brutal illegal military occupation, to use the words of Kofi Annan, the Secretary-General of the United Nations. And this occupation sucked life out of the Palestinians, left them hopeless, desperate, poor, destitute, and they live under a state of siege by the Israelis.

MARGARET WARNER: So are you saying--. 

HASAN ABDEL RAHMAN: I'm saying that Mr. Sharon and the Israeli policies are responsible for pushing those young Palestinians to become terrorists.

MARGARET WARNER: And therefore, is your answer to Secretary Powell who even today called on Yasser Arafat to go after the terrorist attackers, that there is nothing that can be done?

HASAN ABDEL RAHMAN: Unfortunately Mr. Colin Powell is missing the point. He should point fingers to Mr. Sharon to move his soldiers, his army, his settlers, from the Palestinian territories. And I assure you that we are not going to follow them across the green line. We will be able then to live in peace with a state of Israel next to the state of Palestine. But let me tell you what. As long as the Israeli illegal military occupation continues in the Palestinian territories and as long as we have those Jewish Talibans settlers in the Palestinian -- 300,000 of them, the most extreme coming from Brooklyn and New York and other places to settle in the Palestinian territories, we cannot expect to have peace. Peace can be achieved only when those guys leave us alone and leave us as a free people.

MARGARET WARNER: So are you predicting more suicide bombings?



HASAN ABDEL RAHMAN: If this situation continues, if the occupation continues, if the brutality of the Israeli army, the killing of Palestinian young people, the imprisonment of Palestinians, the humiliation of the Palestinians, no one can stop the Palestinians. The only one to stop the violence is to eliminate the causes of violence and the cause of violence is the illegal military occupation.

MARGARET WARNER: Mr. Rahman, thank you very much.

HASAN ABDEL RAHMAN: Thank you very much.

 

Funded, in part, by:      ADM      PACIFIC LIFE          at&t      TOYOTA    

Support the kind of journalism done by the NewsHour...Become a member of your local PBS station.

PBS Online Privacy Policy

Copyright ©1996- 2007 MacNeil/Lehrer Productions. All Rights Reserved.

## Remarks of Hasan Abdel Rahman, Palestinian National Authority, at the National Press Club, Washington, D.C. May 9, 2002 10:00 a.m.  Questions Follow

[Audio feeds of Newsmakers at the National Press Club are available on-line, along with a list of people who appear there, at http://www.press.org]

Good morning and thank you for coming. I was invited here today to share with you our perspective on the situation in the Middle East and discuss with you where we go from here.

All of you are aware of probably the intentions of Mr. Sharon when he waged his latest invasion of the Palestinian territories. His main objective was obvious. He wanted to change the political landscape in the region, undo the Oslo peace process, and construct a new situation in the Palestinian territories that is suitable to his own political and ideological positions.

He inflicted a great deal of damage to the Palestinian Authority infrastructure and to the Palestinian society as a whole. The damage that was inflicted was very extensive on the institutions of the Palestinian National Authority, on the economy of the Palestinian people and on the infrastructure of the Palestinian people: the roads, the electricity, the water, nothing escaped the destruction of the Israeli army.

The number of casualties was very high, it is in the hundreds, and the wounded are in the thousands, adding to the number that was already very high since the beginning of September, the year 2000. So far we have almost about 3,000 Palestinians killed, we have about 38,000 Palestinian wounded. The number of houses destroyed are in the thousands, even the crops, trees were not spared the Israeli destruction.

Mr. Sharon was here in Washington last week. In fact, two days ago. And he made his plans very clear. Mr. Sharon is not interested in making peace with the Palestinians. He is interested in dictating to the Palestinians the terms of surrender. That was very clear from the statements he made before and after meeting with President Bush. When he was asked about a Palestinian state, he said it was premature to discuss the Palestinian state. That's putting himself against the international consensus that includes also the United States.

So we have Mr. Sharon on one side and the rest of the world on the other side. The issue of Jewish settlements in the Palestinian territories. Mr. Sharon refused to discuss the issue of the continuation of building Jewish settlements in the Palestinian territories. One month after the United Nations Security Council adopted resolution 1402 and 1403, still the Israeli army has not withdrawn from the Palestinian cities and towns. Every single Palestinian city is encircled by the Israeli army.

So, the situation in the Palestinian territories continue to deteriorate as a result of the Israeli policies. Mr. Sharon is intent on undermining the international efforts that are being made at the moment to move the region from the brink of total war into the path of peace. I take this opportunity to thank President Bush, and the European leaders and the Secretary General of the United Nations for their efforts they are exerting to move the region back into the political path, because without a vision for peace and without a plan to achieve that peace the region can only go into further confrontation and further bloodshed.

The terms of the political settlement as we see it were made very clear by the Arab Summit Conference in Beirut. The adoption of the Saudi peace initiative, Prince Abdullah, which calls for Israel's withdrawal from the Arab territories that were occupied in 1967, in exchange for the establishment of full diplomatic and normal relations with Israel are the foundations for any peace

process.

We can not, the Palestinian people, accept again to become involved in interim arrangements. Interim arrangements are a formula for the continuation of Israel's occupation. Consequently, they are a formula for confrontation because the Israeli occupation in our views is really the infrastructure of terrorism in our region because occupation is a system of terror and it also a systematic terrorism against the Palestinian people.

So occupation generates resistance. And if we [are] to deal with the whole situation of violence in the region, occupation must end. With all that it entails including, of course, the construction of illegal Jewish settlements in the Palestinian territories. Our position on this is very clear because we have seen the statements made by Sharon and by his advisors, and by his spokesman and the spokeswoman of the Israeli government that he wants long term interim arrangements after which a discussion on final status can take place.

We can not accept that. We will accept a process that the conclusion of which is very clear to us. There is an internationally accepted solution and that is the establishment of an independent Palestinian state along the lines of 1967 boundaries. This end game has to be clear from the beginning and any process must be a plan to achieve that objective and not to negotiate about negotiations or interim arrangements.

This is what I have to say this morning. If you have any questions, I would be more than happy to answer. Thank you very much.


QUESTION: Yes, good morning. I'm Jonathan Reich from Reuters. Hasan, I wondered if you could give your interpretation to us of this sudden interest that there seems to be in reform of the Palestinian Authority? What's your interpretation? How do you explain this sudden interest and how do you intend to deal with it?

RAHMAN: We read about it in the papers. Of course, we were not approached by anyone to ask us for that. However, we feel that good governance and democracy and the construction of and building of efficient institutions of the Palestinian Authority are Palestinian demands, those are Palestinian objectives.

We want to have an efficient government for the Palestinian people. We want a democratic government and we do not need advice from abroad on our needs for that. We will do it ourselves and we will do it to serve the interests of the Palestinian people. Our security institutions of course will be in charge of maintaining law and order in the Palestinian territories. Their main interest and main function will be to preserve the Palestinian security, security for the Palestinian people.

But also it will protect any agreement that we sign with anyone, with Israel or with anybody else. So, we are very ready to engage in reconstruction of our national institutions and the institutions of the Palestinian National Authority.


QUESTION: Good morning. Brad Wright with CNN. It has been suggested that the Israeli response to the latest suicide bombing probably will come in Gaza. Do you believe that's the case? What do you

think the proportion of this will be?

RAHMAN: Well, if Mr. Sharon was looking for a pretext to destroy Gaza, he can have a pretext. This tragic event of the day before yesterday, or any other event, we hope that there will be enough pressure on Mr. Sharon in order not to become involved in such an aggression. Because each Israeli incursion in the Palestinian territories, each killing of a Palestinian by Israel, any destruction of Palestinian property by Israel would only lead to the generation of more defiance and more hostility toward Israel. The Israeli tanks and bulldozers do not bulldoze only Palestinian roads, but they also bulldoze the foundations of possibilities of peace with Israel.

So what we need really is instead of violence and counter-violence is a path outside of this vicious circle. We need to look at the causes of this conflict and deal with them rather than dealing with the symptoms.

QUESTION: I'm Jim Harriet, worldnet TV division of the Voice of America. There is a front page story in the New York Post today that indicates President Bush, I'm paraphrasing, in effect is saying that nothing can go forward until Chairman Arafat goes. Are you aware of the story and your response?

RAHMAN: No, I am not aware of this particular story. I am aware of what is being said on behalf of Mr. Bush by everybody except Mr. Bush himself. So, Mr. Bush has not told us that and from the statements that I hear from members of the administration that's not the case. Mr. Bush and Colin Powell both believe that President Arafat is essential for any progress to be made on the Palestinian - Israeli track and that his role is very very important to move the process forward.

QUESTION: So if I may follow. You're saying that Chairman Arafat stays and Mr. Bush has in effect been misquoted?

RAHMAN: I didn't see that quote by Mr. Bush but what I'm saying that this is the message we get from the administration, that Yasser Arafat is essential for the peace process. His role is important, being the elected leader of the Palestinian people. We have not been told by the Americans any other position.

QUESTION: If that is the position.

RAHMAN: I'm not going really to...

QUESTION: Hypothetical.

RAHMAN: No, I'm not going to deal with hypothetical questions.

QUESTION: Matt Berger with JTA. Do you believe that Chairman Arafat's comments yesterday in Arabic was a significant step and do you believe that it will have an effect on quelling the violence?

RAHMAN: Well I think they are reiteration of previously stated positions. If you look at the speech of Yasser Arafat on December 16th in Arabic it contained exactly the same substance. If you look at the speech of Yasser Arafat that was made to the Arab Summit Conference on March 28th, it included exactly the same thing.

Probably, he used stronger language yesterday, but it is the same substance and our position has been always very clear. We are against any action against Israeli civilians, that's directed against Israeli civilians in the same manner that we condemn and oppose and ask others to do the same when Israel directs its attacks against Palestinian civilians. So that we wanted to have Palestinian and Israeli civilians out of this conflict. So this is a very very principled position of the Palestinian Authority.

QUESTION: But if he's made these comments before and suicide bombings have not stopped, does that say something about his leadership of the Palestinian people?

RAHMAN: No, it does not. It says something about the circumstances. You see Yasser Arafat will make all the statements necessary and he will exert all the efforts that are necessary. But whether he succeeds or not does not depend on Yasser Arafat alone. It depends also on the way the Israeli government and the Israeli army behaves toward the Palestinian people.

You can not tell every Palestinian whose mother or father or children are killed not to react. It's impossible. You can not stop the Palestinians who live under seige, under miserable situation, 60% of them are unemployed, people have to carry their children to school because they are not allowed to drive their cars, if they can not walk if they can not go to their businesses, if they are humiliated on a daily basis, you can't tell them, don't react. Even if you tell them don't react, they are not going to listen to you.

That's why we believe in order for us to succeed in our effort we need two conditions. One is the incentive to the Palestinian public. We have to tell the Palestinian public there is light at the end of the tunnel, your situation is changing. But if all that we are promised is more Jewish settlements and more Israeli oppression then it is... The second is you need the instruments to achieve that and that is Palestinian security forces which has been battered and destroyed by the Israeli troops.

So Yasser Arafat will use his moral authority, he will use his political authority, but in order to achieve that objective much more is needed.

QUESTION: That's close to what I wanted to discuss. My name's Ron Bajus, Kuwait News Agency. If no one can influence Mr. Sharon and to date there is no indication that anyone can, and then if Mr. Arafat can not control Hamas, I question, and I would like you to discuss, how would Mr. Tenet's visit and this idea of reconstituting the Palestinian security. Let's assume that some time passes and it is reconstituted, how would this influence Hamas, Islamic Jihad, is this also futile?

RAHMAN: First of all let me deal with the first part of your question and that is no one can influence Sharon. I believe that Sharon can be influenced. I mean Sharon can not be fighting all international community.

QUESTION: He has to date.

RAHMAN: Well, he has to date because there was acquiescence and tolerance to his positions from the United States. But if the United States...Look at what happened in the United Nations over the question of the international commission of inquiry into the war crimes in Jenin. I mean you have 14 positive votes and only 1 negative vote. If the United States did not provide that protection for Sharon I assure you that Sharon may be indicted for war crimes.

So, the United States can and has the possibilities to pressure Sharon. Sharon can not defy the whole international community. Peace in the region is not so irrelevant that it can be left to Sharon to decide. Because the impact of peace and war in the region has repercussions for the Israelis, for the Palestinians, for the Arabs, for the United States, for everyone.

So you can not let Mr. Sharon free handed because we know how Mr. Sharon operates. Now, as far as Hamas is concerned we, as I said, will do everything within our means to achieve control of those elements who want to carry on actions against Israeli civilians. But whether we will succeed 100% or not is going to depend on Israeli behavior in the Palestinian territories also. Because if Israel behaves in such a way to provoke the Palestinian people, it is difficult to have full control and full success, that's what I'm trying to say. But as far as efforts are concerned we are willing to exert our efforts. Now, results is going to depend also on the Israelis and their behavior in the Palestinian territories.

QUESTION: I'm Laurie Kenney with Hearst Argyle television. Are you concerned at all that in addition to the military response that the Israeli cabinet has apparently authorized that the Israelis will take this opportunity to go that one step further and perhaps arrest and exile Mr. Arafat as has been suggested before and if that were to happen what would be the result be and the result for the Palestinian leadership?

RAHMAN: Well, I hope they will not because if they take such a very drastic and irresponsible and dangerous step, I think they will open the gates of the conflict wide open that it becomes very very difficult to bring the genie back into the bottle.

QUESTION: Are you concerned that it is a real possibility?

RAHMAN: I mean I can not trust Mr. Sharon. And his chief of staff, of course.

QUESTION: Ed Epstein from the San Francisco Chronicle. To follow up on these questions about the calls for reforming the Palestinian Authority and possibly removing Chairman Arafat. At the White House on Tuesday Condolezza Rice was asked repeatedly if Israel should negotiate with Arafat and she just never said yes.

RAHMAN: But did she say no?

QUESTION: She kept saying that he is the elected head of the Authority, but she never would say yes. Also, I believe the President and Condi Rice said that, called for new leadership, that so far the leadership of the Palestinian Authority has failed the Palestinian people terribly. So I think that's where these stories came from plus this calls for reform was seen as kind of a code word to bring new leadership to the Authority. Is that the way you read it?

RAHMAN: I honestly don't feel like getting involved in dispute with president over his assessment of the performance of the Palestinian Authority. I am interested in one thing and that is, does the United States recognize Yasser Arafat as the elected leader of the Palestinian people, or not? If President Bush is asking Arafat to lead better, then he believes that he is the leader. And therefore, that's his opinion.

Now, on the question of the legitimacy of the leadership of Yasser Arafat, I don't think it is anyone's business to decide who is the leader of the Palestinian people except the Palestinians themselves. In the

same way we think that Sharon is a war criminal, but the Israeli people elected him. If you ask 90% of the Arab world, they think that Sharon is a war criminal, and he's a bully and he's a murderer. But that's not our business, that's the Israeli people who elected him and put him there.

We are interested not in the person, we are interested in solving the issues. And so let's deal with the issues, because focusing on the person, in my view, is a pretext for not dealing with issues. Sharon is focusing on Yasser Arafat, not because what he thinks is right or wrong, because he really does not want to deal with issues of occupation, of building illegal Jewish settlements in the Palestinian territories. He does not want to deal with any of those, so he focuses on Yasser Arafat.

QUESTION: What do you make of President Bushes continuing refusal to talk to Yasser Arafat?

RAHMAN: Well, I mean the American administration deals with Yasser Arafat, that's why you have the Secretary of State dealing with him, talking to him almost weekly. The time will come when President Bush will deal with Yasser Arafat. For the time being we deal with the Secretary of State.

QUESTION: Carl Osgood with Executive Intelligence Review. I'd like you to comment on the timing of this latest, most recent bombing, since it came just as Sharon was meeting with Bush in the White House. Even Richard Cohen in the Washington Post this morning suggests that the only person who benefits from this is Sharon himself because it serves his political and ideological purposes.

RAHMAN: I don't believe in conspiracy mentalities. I think that the practical effects of this tragic incident is very damaging to the Palestinian cause. And therefore we are opposed to it and we are against it and I think President Arafat made it clear that he will take action against the, look for the perpetrators and take action against them.

QUESTION: Miles Pomper from Congressional Quarterly. Two questions. One is on this question of political reform it has been suggested that perhaps Mr. Arafat would move to more of a ceremonial role, rather and as a result a prime minister or constitution change would do more of the day to day government of the authority and wanted your reaction to that.

And secondly, wanted your reaction to, there's a bill by Senator McConnell and Senator Feinstein on the Hill to cut ties with the Authority and what effect it would have if it became law.

RAHMAN Well, you know I watched those members of congress in action and I've seen their positions made public on television and honestly I'm very very disappointed by what I see because those positions are neither based on legality nor on morality. And they don't even serve the political interests of the United States.

You have the Senate of the United States and the Congress acting against the President of the United States in support of a foreign power. In my view, this is even nationally irresponsible. Because once when the whole world is moving in one direction and the Congress of the United States is trying to gear things in a totally opposite direction.

I am totally disappointed when I see the Congress of the United States that is supposed to be the bastion of law and order, of rule of law and democracy, endorsing an action by a government that was

condemned by everyone in the world including the United States of America. So, this tells something about the motives and the reasons behind those positions. It is not that the whole world is wrong and that Diana Feinstein is right. So, again, if it illegal and if it is immoral, I don't think it's wrong to have an irrelevance to what happens in our region.

QUESTION: Barry White AP. Could you please elaborate a little bit about the Palestinian Authority's willingness to engage in reconstituting security forces? I mean do you see particular things down the road: talks, also, small point, I'm a little confused because the Palestinian position has been that these forces were decimated by the Israelis, so how much work has to be done?

RAHMAN: Well, not every one single Palestinian who was a member of the security was killed, I'm not saying that. What was decimated is the infrastructure, namely the buildings, the automobiles, the cars, the files, etc. etc. So you have to reconstitute those.

Now, the reconstitution of the Palestinian Security Forces will be in accordance with the perceived needs of the Palestinian people, that's what I'm trying to say. And definitely we have to reconstruct those works. We will use technical assistance from anyone who offers it to us. We will discuss among ourselves how to build, rebuilt it in a more efficient way. But again, the guiding, the guidance for that are the interests of the Palestinian people and the maintenance of the law and order in the Palestinian society and, of course, to safeguard any commitments that we make with our neighbors including Israel.

QUESTION: Are there meetings with the Americans?

RAHMAN: We have not had any Americans visiting. We heard Mr. George Tenet will come to the region and we welcome him.

QUESTION: Kittery McKenzie with Southern News. The suicide bombings, as you have said, give Sharon the excuse, the fig leaf not to deal with the settlements and the underlying issue of the occupation. How do you impress upon Bush and others that that is indeed the case and try and change that. I've just come back from there and the Israeli people, the Jewish people, many of whom were indeed in the peace camp in '95, '96 are now firmly behind Sharon because they don't feel that they've got any, that they can escape the suicide bombing, so how do you break (unintelligible)?

RAHMAN: Well, we realize that the peace camp in Israel has been damaged and we are very concerned about that because those are our partners in the peace process. And for any future peace between the Palestinians and Israelis the overwhelming majority of the Israeli society must join the peace camp, we are very aware of that. Otherwise we can not make peace with Israel because you may reach an agreement with the Israelis, unless the public supports it, it is not going to work.

In the same way on the Palestinian side. If you look at the Palestinians also, we are at 75% or more support for the peace process. Today maybe this number is much much less. But there is something very interesting about the polls in Israel and on the Palestinian side. While you may have 80% of the Israelis support Sharon, yet you have a majority that supports the peace process, if and when it can be achieved. On the Palestinian side, the same thing. You may have 82% of the Palestinians who are supporting violence against Israel, but 70% will support a peace agreement with Israel based on the accepted fundaments of a peace.

Remarks of Hasan Abdel Rahman

In other words, when there is confrontation it is always the right wing, the extremists will be in the majority. When there is a process on the table, I believe, it will be supported by the overwhelming majority of both sides, Palestinians and Israelis alike.

So, even President Bush in the presence of Sharon the other day said hopelessness creates suicide bombers. I think he was addressing himself to Mr. Sharon. That the conditions of the Palestinian people have to really improve considerably so we can succeed in our effort to stop the suicide bombing, not ... I am opposed, I want to make it clear, I am opposed to suicide bombing not because of what it does to Israel only, but because of what it does to our society.

I don't want to see Palestinian youth wanted to die and kill others in the process. We want a Palestinian youth that loves life, because that's the way I was brought up. And that's how my generation was brought up. And I blame Israeli brutality for brutalizing the Palestinian society. Turning a very peaceful society into a violent society. Because the system of violence imposed on the Palestinians turned many many Palestinians into violence.

If you look at our society before 1967 and after 1967 any sociology can study of the Palestinian society behavior before 1967, even before Likud came to power in Israel, will find out that violence was very very minimum. In fact, it was unknown as I was growing up in Palestine. And today, it has become the norm as a result of the occupation and what it has done to the Palestinian society. And I hope that we can reverse this process. We can go back. Because even if you look at the eight years of peaceful negotiations with Israel, you will have the curve going down.

In the year 2000, until September, there was not one single suicide bombing. And now it is going up because the number of Palestinian casualties, the pain inflicted on the Palestinians is so huge that it turning people who would have otherwise not been even involved politically into... involved into becoming involved in resistance and violence.

QUESTION: If I may just go back to the question. You don't appear to be able or you're not succeeding in getting that point across whereas the Israelis and Sharon have managed very successfully with their spin machine to turn this into September 11th and a war on terrorism. Whereas the fundamental point of occupation and of the settlements is not being addressed.

RAHMAN: That is absolutely true. And that is not only due to our failure in reaching the American public and the Israeli public, but also to the overwhelming propaganda machine that is working day and night to perpetuate those distortions. You know you look around and you see that is the business of the pro-Israeli think tanks in this city, the media who support Israel, the right wingers in this city and around the country, but I mean haven't you noticed that there is a difference between American public's perception and the rest of the world's perception of what is going on?

Even in Israel there is much more debate within the Israeli Knesset over Sharon's policy than in the American congress. There is much more debate within the Israeli press over Israeli policies than in the American press. But that's not the case outside the United States. Because here it seems that anyone who is engaged in criticism of Sharon's policies is intimidated by either being called an anti-semite or anti-Israel, so people are really, or for any other reason. But that's not the case elsewhere.

Thank you very much, really.

Return to Institute of Election Analysis Home Page

Contact: <u>Joshua Leinsdorf</u>

CNN.com                                                                                              Page 1 of 3



CNN Europe | CNN Asia | Languages ▾ | On CNN TV | Transcripts | Headline News | CNN International | About CNN.com | Preferences

| Home Page |
| World |
| U.S. |
| Weather |
| Business |
| Sports |
| Politics |
| Law |
| Technology |
| Science & Space |
| Health |
| Entertainment |
| Travel |
| Education |
| Special Reports |

SERVICES
Video
E-mail Newsletters
CNNtoGO
SEARCH

Web ⦿ CNN.com ○



# TRANSCRIPTS Transcript Providers

| Transcript: |     Return to Transcripts main page

## CNN SUNDAY MORNING

*Interviews With Daniel Avalon, Hasan Abdel Rahman*

Aired September 22, 2002 - 08:13   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS
FINAL FORM AND MAY BE UPDATED.

MILES O'BRIEN, CNN ANCHOR: Continuing our discussion of the
Israeli -- Palestinian conflict, which is focused right now on Yasser
Arafat's four city block compound in Ramallah. Inside that compound
is Yasser Arafat.
What is the goal of the Israeli operation as it continues? Is it to get
some wanted criminals from outside of that compound or is it, in fact,
the exile of Yasser Arafat?

We're going to discuss this from both sides of the issue. Joining us first from New York is Daniel Avalon, foreign policy -
- excuse me -- he is the U.S. ambassador -- Israeli ambassador to the U.S.

I think I have that correct. Ambassador, good to have you with us.

DANIEL AVALON, ISRAEL'S AMBASSADOR TO U.S.: Thank you. It's a pleasure to be here.

O'BRIEN: It's our pleasure as well. What is the goal, Ambassador? Is the goal to prompt Yasser Arafat into an exile?

AVALON: No, Miles. At least if it had been the goal could have been achieved really in one hour. Military operations
could be conducted and the situation is that we could have done it long ago. But this is not the goal.

Our goal is really to stop the terror -- to stop the killing of innocent Israelis so the country can resume normal lives like
any other country -- so mothers can send their kids on buses to school without being afraid that the schools and
discotheques and restaurants will be killed by this brutal Palestinian terror.

So all our aim is to get the criminals which are in Arafat's offices. He gives them shelter -- he protects them. All we need
is their removal from there and then the operation is over.

O'BRIEN: Let me ask you this though. If, in fact, and I believe the number is now some 50 people that you believe are
inside that compound who are wanted -- if, in fact, they were turned over, would this be the end of the siege of the
Ramallah compound?

AVALON: By all means -- that's what we say -- it's in their hands. If they just come out and then given due procedures
with the law -- and we do have a very just court -- this will be over. There are terrorists there who direct, finance and
conduct terrorist operations. The latest was three days ago when six Israelis were blown up in a bus downtown Tel
Aviv.

O'BRIEN: I understand your goal and I understand your frustrations given the state of suicide bombings that we've
witnessed unfortunately. But the intended effect might actually differ from what really happens, which is this actually
galvanizes support behind Yasser Arafat.

There's got to be concern in Israel that every time the siege is ratcheted upward more and more people rally to Yasser
Arafat's cause inside.

AVALON: Well, Miles, I'm not sure this is the case. It is true that he is trying to galvanize support by conducting terror
but I think that his status is further compromised. And I don't believe that in the long term the case will be such that he's
back in the picture.

I think that most people understand around the world that he has betrayed the Palestinian cause and dreams and he is
the one who worst serves their national interest.

He cannot be managing a whole apparatus of terror. He is really I would say directing a coalition of terror whereby
Hamas and Tanzim. He's owned terror organizations of the Fatah, of Arafat's organization -- are collaborating together
in an effort to frustrate peace efforts -- indeed to destroy any kind of hope for reconciliations.

But we are hopeful because we have in the past proven Israel wants peace. When we have real partners -- partners who are trustworthy, effective, serious and committed to peace, we make concessions.

This was the case with Egypt when they had leaders like Anwar Sadat. Jordan had King Hussein.

We hoped that the Palestinians would produce such a leader but so far they have not. And I have no doubt that ultimately there will be a leader committed to peace and then both people can have the peace they deserve.

O'BRIEN: Ambassador, one of the stated goals of Israel and the U.S. in all of this is to see some fundamental reform inside the Palestinian Authority. And it appears that that reform at least was budding somewhat prior to these two suicide attacks and the latest siege.

All of that is now on the back burner to say the least.

That has got to cause some concern when you look at the long range goals of trying to come up with some kind of way of a cohesive peace plan.

AVALON: Well, these are two different issues. First of all, I would really take an issue about the reforms. We have not seen anything really developing.

So long as Arafat keeps the reins of the finances financing the terror and the power over the security/terrorist organizations there are not really reforms to speak about.

But, irrespective of that, once we are attacked -- once there are terror actions in our streets -- we must defend ourselves.

This is what every other country -- any other country would do. And this is what we are doing. We're still calling for real reforms for new leadership to emerge. But first and foremost we need the end of terror. They have to stop the terrorists, they have to arrest them, they have to dismantle the terrorist infrastructures, dismantle the terrorist explosive laboratories and cashes -- just come forward and talk peace.

O'BRIEN: All right. Daniel Avalon is the Israeli ambassador to the U.S. We appreciate your comments on this.

AVALON: Thank you.

O'BRIEN: And let's turn it now to the other side. Neither of these gentlemen wanted to appear together at the same time so we're doing it back to back.

Hasan Abdel Rahman is the chief Palestinian representative to the U.S. He had the benefit of hearing Mr. Avalon.

And let's pick up on that point that he made, which seems to be a very valid and difficult point to counter, which is -- stop the terrorism -- nip the terrorism in the bud.

What's the matter with that call for action on the part of the Israelis?

HASAN ABDEL RAHMAN, CHIEF PALESTINIAN REPRESENTATIVE: I believe that what perpetrates violence is Israeli behavior towards the Palestinian people. Remember that Israel is occupying the Palestinian territories for 36 years now.

Israel is building settlements in the Palestinian territories ...

O'BRIEN: Well, Mr. Rahman, wait a minute. Are you justifying that -- the terrorism then? Is that what you are saying?

ABDEL RAHMAN: Sir, I'm trying to explain the environment in which violence erupts. When you have Israeli Army killing Palestinians -- in the last 45 days alone not one single Israeli was killed -- six weeks and a half.

There were 75 Palestinians assassinated by Israel -- 40 of them are children. Isn't this (UNINTELLIGIBLE) that behaves like (UNINTELLIGIBLE)? Or does Palestinian life not count like an Israeli life? We have to remember that in the City of Nablus alone for 46 days 250,000 people are under curfew constantly. Isn't this terrorism by Israel? We have to be very -- we believe that Israel has the right to live in security but Israel has no right under any law to occupy other people, torture them, humiliate them, deprive them of their dignity and freedom.

O'BRIEN: Mr. Rahman ...

ABDEL RAHMAN: I asked ...

O'BRIEN: ... why not release some of those wanted people that Israel demands and allow them to be subjected to a trial? What's the matter with that?

Sir, wouldn't that be an action -- a concrete action indicating defiance of terrorism within the Palestinian Authority?

ABDEL RAHMAN: Sir, first of all, those are officials of the Palestinian Authority. This whole thing about being terrorist is a distortion of the facts. We never heard from Israel until yesterday that they wanted any of those people.

This is a protector to humiliate Yasser Arafat in the eyes of his people by showing him handing his own officials to the Israeli Army.

This is unacceptable. This is a (UNINTELLIGIBLE) behavior by any law and by any standards.

This is not the way to deal with the leader of another people. That's why Yasser Arafat and his aides are not going to be surrendering to the Israelis.

Imagine the view of Yasser Arafat handing his deputies to the Israeli Army. Listen -- we believe that Sharon is a terrorist and we believe that every single Israeli who kills Palestinians is a terrorist.

Would Mr. Sharon hand his own people to us?

O'BRIEN: Is Yasser Arafat, Mr. Rahman, headed for exile?

ABDEL RAHMAN: No, he is not. Yasser Arafat is in his own land. The Israeli Army should leave us. The Israeli Army is an invading army. The Israeli Army has no right to be there. The Israeli Army belongs to Tel Aviv and not to Ramallah.

So when (UNINTELLIGIBLE) speaks of the right of Israelis to live in peace, we believe in that. But we have also the right to live in peace in our own country -- in our own state.

He has to take his settlers away. They brought 300,000 Jewish settlers into the Palestinian territories. We have 75 Jewish settlements built under Mr. Sharon alone in violation of international law, in violation of the United States' policy.

That's what we have to look at -- what provokes the Palestinians into becoming (UNINTELLIGIBLE) ... O'BRIEN: Mr. Rahman?

ABDEL RAHMAN: ... behavior?

O'BRIEN: Mr. Rahman?

ABDEL RAHMAN: Yes?

O'BRIEN: Is Yasser Arafat in control? And, if he is -- if the answer to that is yes -- why doesn't he stop the suicide bombings?

ABDEL RAHMAN: Well, first of all, he is not in control because he has been under house arrest for six continuous months. He could not leave his headquarters.

Look at what the Israelis are doing. They are depriving him of the means to be effective and then blaming him for not being effective. Isn't this absurd and ridiculous?

You have a man for six months under house arrest, you destroy all of his security agencies and then ask him why not. And Israel is having 50,000 Israeli soldiers in the Palestinian territories and they are asking Arafat to protect Tel Aviv. Isn't that ridiculous?

O'BRIEN: Hasan Abdel Rahman, that's all the time we have unfortunately. We apologize for cutting you off but we appreciate your insights and comments.

ABDEL RAHMAN: Thank you.

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

© 2004 Cable News Network LP, LLLP.
A Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us.

All external sites will open in a new browser.
CNN.com does not endorse external sites.

CNN.com - Transcripts



**Breaking News»**   Five people killed in small plane crash in Central Florida, officials say.

SEARCH   ⦿ The Web   ○ CNN.com

| Home Page |
| World |
| U.S. |
| Weather |
| Business |
| Sports |
| Politics |
| Law |
| Technology |
| Science & Space |
| Health |
| Entertainment |
| Travel |
| Education |
| Special Reports |

SERVICES
Video
E-mail Newsletters
CNNtoGO
SEARCH
Web ⦿ CNN.com ○

# TRANSCRIPTS   Transcript Providers

**Transcripts**   Return to Transcripts main page

## LIVE FROM THE HEADLINES

Interview With Hasan Rahman, Mark Regev

Aired May 30, 2003 - 19:44   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

DARYN KAGAN, CNN ANCHOR: President Bush is heading to the Mideast next week. We're going to look now at the prospects of peace for peace from both the Palestinian and Israeli perspectives. Hasan Abdel Rahman Palestinian Authority's representative to the United States is right here with me in New York City. Mark Regev is the spokesman for the Israeli embassy in Washington. Gentlemen, good evening to both of you.

We're going to start by playing off of Kelly Wallace's piece looking at the different Palestinian groups. But, Mr. Rahman, I want to focus on Hamas. How much power does Mahmoud Abbas really have to rein in a terror group like that?

HASAN ABDEL RAHMAN, PALESTINIAN REPRESENTATIVE TO U.S.: Well I think the question is not how much power he has because the power now has been destroyed. The official formal security agencies has been...

(CROSSTALK)

RAHMAN: He can have the political power. You know, we have to go back to the origins of all of this. There has been occupations going on for the last 35 years...

(CROSSTALK)

RAHMAN: If there is a feasible, credible, peace process that will end the suffering of the Palestinian people that has lasted for 35 years, that will end Israeli demolishing of homes, Jewish settlements on Palestinian territories, assassination of Palestinian leaders, destruction of Palestinian homes, if there's a credible process that eventually will give the Palestinian people their right to self-determination and an independent state and we feel that the road map can do that.

If Mr. Sharon adheres to the text and the spirit of this road map, I believe Abu Mazen it will have the support of the Palestinian settlers.

KAGAN: I can see where this is going already. If someone else said something first...

(CROSSTALK)

KAGAN: I want to bring Mr. Regev in and then kind of put him on the hot seat here and say can Ariel Sharon rein in the settlers and change that situation?

MARK REGEV, ISRAELI EMBASSY SPOKESMAN: Most definitely. There's no question about that whatsoever. Israel will do whatever we can to help President Bush's trip to the region succeed, to make the peace plan succeed and to help Abu Mazen and the Palestinian reformers succeed.

We want peace. We are willing for concessions. We are willing to come up to the plate and hope this process works. We want this peace to work.

KAGAN: But, Mark, one of the things that the Palestinians are going to say, and I don't mean to speak for you, Mr. Rahman, but they're going to say well then, fine, go ahead, accept the whole road map just as the Palestinians have done.

REGEV: Well we're accepted the steps in the road map and we've even said something I think more important. We

have said to the Palestinian leadership, the new leadership of Abu Mazen, we have said we are willing to pull out. We are willing to pull out of the cities of the West Bank. We are willing to return to the lands before the violence and terrorism started. Just say where you want us to move. Tell us where we can start pulling out where you can already start to rein in...

(CROSSTALK)

RAHMAN: ... to go take your troops and your settlers into Israel instead of having them on the West Bank in the Palestinian territories. Because...

(CROSSTALK)

RAHMAN: As much as the Jewish settlers are in the Palestinian territories and the Israeli soldiers are in the Palestinian towns, that is going to provoke Palestinians.

The only way you can do that and have Palestinians quiet is to have those tanks out of the Palestinian villages and towns and allow the Palestinians to be a free people like you are.

(CROSSTALK)

KAGAN: I want (UNINTELLIGIBLE) steer this in another direction here because we have seen some movement although it's been small. And I just want your perspective from both of you on one single word that was uttered last week. And that was Ariel Sharon using the word "occupation."

RAHMAN: I think that's important.

KAGAN: This man, I mean Ariel Sharon of all people saying, call it what you want. Now he kind of back tracked afterwards. But he used the word occupation...

(CROSSTALK) RAHMAN: ... he has in his government, the most lunatic, extremist...

KAGAN: OK, before we go to naming names -- calling names...

RAHMAN: But that's exactly what...

KAGAN: But take a step back and talk to me about when you first heard him say those words, how significant...

RAHMAN: I thought that was definitely a positive step by Mr. Sharon because he finally, after 35 years, realized that this land is Palestinian land and the Israelis (UNINTELLIGIBLE) occupied. And what happens to occupiers? They have to leave.

Why he does not accept the full text of the road map and the steps in the road map. We have done that. We have no problem in accepting the right of Israel to exist, within the 1967 boundaries. But we want Israel also to accept our right to have state on our territories in 1967 borders.

KAGAN: OK, Mark, let me bring you into this. I want to look forward to when President Bush sits down in Jordan with the two prime ministers. How helpful, how significant is it that President Bush is taking this step?

REGEV: Oh,it's very significant and we're supporting the president's trip and we'll do everything, as I said, to make this a success. As I've said, Israel is willing to do very tangible things on the ground to help empower the Palestinian moderates.

The only reason we had to go into the Palestinian cities was because groups like Hamas and Islamic Jihad were organizing those terrible, murderous suicide bombings. Now if the Palestinians can take charge of their own affairs, if they can really bring an end to this, then many things become possible.

I hope that with Abu Mazen taking charge that we can move aggressively and quickly forward in our process of peace, that we can move to implement the steps in the road map. As President Bush said just today, everything will depend on the terrorist issue. If the Palestinians are serious, if Abu Mazen is good on his word. He said he wants to disarm Hamas and Islamic Jihad. He wants to stop terrorism. If he really is good on his word, and we'll do everything we can to help them, a new Middle East is really possible.

KAGAN: Well, we will see if this is indeed a new day.

I'm going to have to let Mr. Regev have the last word because he had the first word. OK?

Hasan Rahman, thank you so much for your time. Mark Regev, thank you for joining us from Washington. Appreciate it. Gentlemen, thank you so much.

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

CNN.com - Transcripts

SEARCH    The Web ⦿  CNN.com ○ [                    ]

© 2005 Cable News Network LP, LLLP.
A Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us.

All external sites will open in a new browser.
CNN.com does not endorse external sites.

✵  Denotes premium content.

Add RSS headlines.

CNN.com - Transcripts


.com.

SEARCH  ⊙ The Web  ○ CNN.com

| Home Page |
| Asia |
| Europe |
| U.S. |
| World |
| World Business |
| Technology |
| Science & Space |
| Entertainment |
| Travel |
| Weather |
| World Sport |
| Special Reports |
| ON TV |
| What's on |
| Business Traveller |
| Global Office |
| Principal Voices |
| Music Room |
| Spark |
| Talk Asia |
| Services ▾ |
| Languages ▾ |

# TRANSCRIPTS  Transcript Providers

**Transcript:**    Return to Transcripts main page

## CNN SATURDAY MORNING NEWS

**Interviews with Alon Pinkus, Hassan Abdel Rahman**

Aired September 13, 2003 - 07:37   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

STEPHEN FRAZIER, CNN ANCHOR: We're going to look forward as that cycle of violence continues. And the big question is whether Israel will remove Yasser Arafat. Israel says he is an obstacle to peace. Palestinians do not agree.
Hassan Abdel Rahman is the chief Palestinian representative to the United States and we will get reaction from him in just a moment.

First, let's talk with Alon Pinkus, who is Israeli Consul General in New York.

Mr. Consul General, welcome.

ALON PINKUS, ISRAELI CONSUL GENERAL: Thank you.

Good morning, Stephen.

FRAZIER: Good morning to you, sir.

We are still interested in hearing the legal justification for this removal. It sounds almost as though Israel is trying to chose Palestinian leaders.

Does it have that right?

PINKUS: No. We don't have the right and we're not choosing Palestinian leaders. And there -- but there is no legal justification. The justification is moral, it's political, it is based on national security and when you have a walking one man weapon of mass destruction that has done nothing in the last 10 years but flirt with violence, incite violence, carry out violence, justify violence and glorify violence, then you have to do what you have to do. And you know the cliche, if he walks like a terrorist, sounds like a terrorist, then maybe he is a terrorist.

FRAZIER: Are you comfortable with the idea that because Mr. Arafat's compound is surrounded that any attempt to remove him may lead to violence, possibly to his death?

PINKUS: No, I'm not happy about that at all and I hope we won't get to that and I truly do not believe, Stephen, that it will get to that. But you have to, you know, you have to understand something very simple. We have given this man every opportunity in the world. The doors to the White House, the doors to Ten Downing, the doors to Moscow and Paris and Berlin and Rome were open to him. He was a frequent guest in Israel. He visited the homes of prime ministers. We have negotiated with him. I met him four times and I wasn't the prime minister. We all met him, we all did stuff with him.

He betrayed our trust. He embezzled the funds of the Palestinian Authority. He promised nothing to the Palestinians but more misery, more blood and more tragedy.

I think it is that first and foremost -- and, again, I'm going back to what you asked me, and I agree with you, it is not our job to determine the Palestinian leadership. But if you ask me candidly, this man, it should be in Palestinian interests to remove this man from the political scene.

FRAZIER: There's always the question of the devil you know and the devil you don't, and I'm speaking there as a devil's advocate, if you'll apologize for my use of this metaphor. What would happen after his removal, in your estimation?

PINKUS: Well, I don't know that he's being removed imminently. But the problem -- see, one of the things that we demanded for a long time, for several years, and one of the things that President George W. Bush demanded last year was that the Palestinians undergo serious and deep political reform. One of the outcomes, one of the positive outcomes, I might add, was the election or selection of Prime Minister Mahmoud Abbas, who just resigned 10 days

ago.

We have warned ever since his election, and we have assessed that as long as Arafat remains with some powers, as long as he possesses residual executive powers, no Palestinian prime minister could succeed.

Now, there are 12, 12 separate security organs in the Palestinian Authority. The U.S. has only the CIA and the FBI and local police departments. The Palestinian Authority has 12 FBIs, 12 paramilitary organizations, 12 armed forces. He controls most of them. If he is removed, I mean seriously removed from any position of political power, then a new Palestinian leadership -- which I don't expect to be more pro-Israeli or more forthcoming in terms of my interests. I expect them to be just as much Palestinian nationalists. But a new, clean, candid, honest and fair Palestinian leadership will take over this power and the devil that we don't know could very well prove to be much, much better or a preferable alternative to this devil that we do know.

FRAZIER: Well, we are grateful for those insights, as we watch this very tense situation.

Alon Pinkus, Mr. Consul General, thank you for joining us this morning.

PINKUS: Thank you, Stephen.

FRAZIER: Now to Hassan Abdel Rahman, who is the Palestinian representative to the United States.

Mr. Rahman, thank you for joining us this morning.

HASSAN ABDEL RAHMAN, CHIEF PALESTINIAN REPRESENTATIVE TO THE U.S.: Thank you.

Good morning.

FRAZIER: I have to ask, is it possible that Mr. Arafat could be moved to another location but still retain his authority, as he did from Tunis for so many years?

RAHMAN: Well, first of all, I don't believe that Yasser Arafat is going to be removed. He's not going to allow himself to be removed and the Palestinian people are not going to allow him to be removed. Because his removal, first of all, is illegal, it is immoral and it is particularly counterproductive.

It is illegal because Yasser Arafat is a Palestinian citizen. No power should be able or should have the right to remove the elected leader of another people.

Morally, I mean what the Israelis are doing in the Palestinian territories, they are an occupying force. They do not expect the Palestinians to throw flowers at them. They build settlements in our lands. They occupy our people. They use violence. They use the, what we call the terrorism of the tanks. Anyone who is watching the streets of the Palestinian territories will see tanks roaming around inside residential areas, bombarding Palestinians in their homes, in their towns.

So, when Mr. Pinkus speaks about terrorism, I become really amazed at the callousness of the Israeli speaker.

FRAZIER: We are looking at pictures from Ramallah right now as you speak, sharing the screen with you.

RAHMAN: Yes.

FRAZIER: And I have to ask what your role in the United States is during these very tense moments. Have you been speaking in your diplomatic capacity? Have you been asking the United States for a reaction?

RAHMAN: Yes, and the Americans have assured us that they disagree, like everyone else in the world, yesterday in the Security Council of the United Nations. There is a blanket of condemnation for Israeli action and the Israeli decision, because it's going to be counterproductive.

I personally believe that Mr. Sharon's policy has failed. He failed to posing or doing anything that will further the peace process, so instead of dealing with the issues, he is personalizing the conflict. He's personalizing the conflict by making Yasser Arafat look like as if he is the problem.

But if we look at the last three months and what happened since President Bush launched the road map in Sharm el-Sheikh and in Aqaba, we see that Israel continued building settlements in the Palestinian territories. They continued to build the wall. They continued the assassination not withstanding that we had 50 days of total cease-fire on the Palestinian side.

So...

FRAZIER: And since the president launched that initiative, as you cite, Mr. Rahman, he has been making several unflattering comments about Chairman Arafat. Certainly that is dismaying to you.

RAHMAN: Yes. But this is not new. What we have to look at what the administration have said about Israeli compliance with the road map. The Americans told the Israelis don't build the wall and Mr. Sharon defied President Bush in the White House and said I will build this wall on Palestinian territories. They told him to dismantle the illegal Jewish settlements in the Palestinian territories and he said we are not going to dismantle those Jewish settlements in the Palestinian land. He told him to stop building new settlements and Israel continued to build settlements. He told him to stop assassinating Palestinians and he continued to assassinate Palestinians.

So Mr. Sharon did not do anything that Mr. Bush asked him to do.

CNN.com - Transcripts

FRAZIER: Well, this is a...

RAHMAN: I am sure that President Bush is not happy with the behavior or Mr. Sharon. That defies him in the very White House when they were standing together. Mr. Sharon said, no, Mr. President, I'm not going to do this.

FRAZIER: Understood.

Well, we, again, are grateful for those insights. A very delicate time and we appreciate your helping us understand the dynamic now.

Hassan Abdel Rahman, thank you for joining us this morning.

RAHMAN: Thank you.

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

---

CNN US    Languages    On CNN TV    E-mail Services    CNN Mobile    CNN AvantGo    CNNtext    Ad info    Preferences

SEARCH    The Web    CNN.com

© 2005 Cable News Network LP, LLLP.
A Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us.

All external sites will open in a new browser.
CNN.com does not endorse external sites.

Denotes premium content.



Global Programs >> Undergraduate Students >> Maxwell in Washington Semester >> Highlights

# Global Policy Seminar

## Fall 2003 Highlights:

Thursday, August 28
*U.S. National Security- Interests, Values, Strategy*
Meeting with **Dr. Cory Schalke, National Security Council, Director for International Defense and Arms Control.** Dr. Cory Schalke has played a significant role in drafting the national Security Strategy Review of the Bush Administration. The document that Dr. Schalke drafted is a far-reaching statement of the Administration's priorities and approaches to international affairs and merits careful reading. It initially provoked a media flurry and controversy over its ideas about pre-emptive/preventive military action (e.g. Iraq.)

Thursday, September 18
*Evolving Situation in Iraq and U.S. Policy*
Attending the **House Armed Service Committee Hearings** on **U.S. policy and operations in Iraq** at the Capital Hill. **Deputy Secretary of Defense Wolfowitz,** General Peter Pace (Vice Chairman of the JCS) and Under Secretary of Defense, Dov S. Zakheim will testify.

Thursday, October 23
*The U.S., Europe, The Middle East: Divided Views*
Meeting with **Amy Hawthorne, Carnegie Endowment for International Peace. Amy** will talk about **prospects and problems for democratization in Iraq.** Amy is currently working on a special project on Democratic reform in the Middle East.

Briefing with **Hassan Rahman, Chief Representative of the PLO/PNA. Hassan** will discuss about the **current Palestinian-Israeli Situation.**

Former Ambassador **Phillip Wilcox, The Foundation for Middle East Peace** will give a **presentation on Israel and Palestine**. Ambassador Wilcox has served in Jerusalem among other posts.



Finally, we will visit **Brookings Institution** with **former U.S. Ambassador to Israel and Director of the Saban Center of Middle East Policy, Martin Indyk.**

Thursday, October 30
*Global Substance Abuse Crisis and the War on Drugs*
Discuss the **Plan Colombia** with **Ingrid Vaicius** of the **Center on International Policy.** Visit **Office of National Drug Control Policy (ONDCP)** to gain the **U.S. Government view on Plan Colombia and U.S. Government International Activities.** Brief visit to the **DEA Museum** across from Pentagon City. Look over the **President's National Drug Control Strategy for 2003.**

Thursday, November 13
Visit **Supreme Court** and meeting with **Court's Judicial Fellow.**

Thursday, November 20
Meet **Maren Zerrifi** of the **Arab American Institute**. Maren will take up the current developments in Palestine/Israel from a Palestinian vantage. Visit **National Science Foundation (NSF)** for a meeting with **Julia Moore** on **General Modified Organisms (GMO)** a technical issue that has important ramifications for agriculture, trade, perhaps health and well-being worldwide. Julia has served at the **State Department and in communications for the NSF,** and spent the past year at the **Woodrow Wilson International Center for Scholars** researching this issue. Visit **Delegation of the European Union** and meet with **William Burros.** Bill will discuss **US-EU relations, differences over the Middle East and economic concerns.**

Undergraduate Global Policy Seminar

For more information contact Neil Bartkowiak, the Global Programs
Coordinator, at global@maxwell.syr.edu.

*This page current as of: May 24, 2004*

 **The International Relations Program**
**Maxwell School of Syracuse University**
*Advancing citizenship, scholarship, and leadership around the world*

 225 Eggers Hall / Syracuse, NY 13244
Tel: 315.443.2306 / Fax: 315.443.9204

MilkenInstitute.Org > Events > > Speakers > Hasan Rahman

Page 1 of 2

# MILKEN INSTITUTE
A PUBLICLY SUPPORTED INDEPENDENT ECONOMIC THINK TANK

Sign In    Your Account

Tuesday, July 10, 2007

Home    Research    Publications    Events    Presentations    Newsroom    Speakers Bureau    About Us

Contact Us    Support M.I.    Site Help

MilkenInstitute.org > Events > Conferences Global Conference 05 > Speakers > Hasan Rahman

## Conference Links

📁 Conference Home

📁 Speakers

📁 Program

📁 Why Attend?

📁 Who Attends?

📁 Testimonials

📁 Sponsorship Opportunities

📁 Registration

📁 Conference Contacts

📁 Conference Materials

----------------------

## Events

📁 Conferences

📁 Financial Innovations

📁 Forums

📁 MI Associates

📁 Roundtables

📁 Seminars

----------------------

**MILKEN INSTITUTE GLOBAL CONFERENCE**

Building a Prosperous Future

April 18 - 20, 2005
Los Angeles

### Speaker's Biography:

### Hasan Rahman
Chief Representative of the Palestinian Liberation Organization (PLO) and the Palestinian Authority

Hasan Rahman is Chief Representative of the Palestinian Liberation Organization (PLO) and the Palestinian Authority heading the Palestinian Mission in the United States. Rahman has extensive experience in the field of public diplomacy. From 1992 to 1993, he was chief of the Palestinian mission in Canada. From October 1991 and September 1993, Rahman served as senior political advisor to the Palestinian delegation to the Madrid peace conference and the peace talks in Washington D.C. From 1982 to 1988, he was the head of the Palestine Information Center in Washington, D.C., and from 1974 to 1982, he served as Deputy Chief Representative to the PLO's permanent mission to the United Nations where he represented Palestine on special committees of the Security Council and General Assembly. Rahman has given presentations on Palestinian issues and the Israeli Arab conflict at universities, think tanks and clubs in the U.S. and abroad. He has represented the PLO and the PNA at various international conferences and other forums. He is a frequent guest on television news programs on CNN, NBC, CBS and ABC. His interviews have been printed in the U.S., Arab and Latin American press. Rahman is fluent in Arabic, English Spanish and Portuguese. Rahman earned his bachelor's in political science at the Catholic University of Puerto Rico, his master's in public administration at the University of Puerto Rico and he was a doctoral candidate in comparative politics at City University of New York.

### Panel:
Privatizing the Peace Process: Market Solutions to the Middle East Conflict

Sponsors



View Sponsorship Opportunities

----------------------

Order DVDs

Order session DVDs for 2005 Global Conference

----------------------

Conference Poll

**What is the most important issue facing the world today:**

○ Terrorism / security

○ Health care / medical research

○ Education

○ Energy sustainability / environment

○ Globalization / trade

○ Changing geopolitical landscape / rise of China and India

○ Other

Submit

Conference Quotables

"As advisors, maybe (economists) are responsible for the fall of Russian Communism."
**-- John Nash, Nobel laureate, 2000**

----------------------

Nobel Laureates

View the Nobel laureates who have appeared at the Global Conference (PDF format).



©2007 Milken Institute    Contact Information    Privacy Statement    E-mail the Webmaster

# Exhibit D



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

🖨 CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
April 30, 2003

## Press Briefing by Ari Fleischer

- President's schedule
- President's statement on the road map
- Statement on judicial nominees
  - Reference B
  - Reference C
  - Reference D
  - Reference E
- Middle East road map
  - Reference B
  - Reference C
  - Reference D
  - Reference E
- Message to Syria
- Iraq/lifting of sanctions
- Tax cuts/Chairman Greenspan's comments
  - Reference B
  - Reference C
  - The deficit
- NRA/assault weapons ban
- Official end of the war
- Al Qaeda capture
- President's speech in San Diego
  - Reference B
  - Reference C
  - Reference D
- Colombia
- France/aid to Iraq
- WMD in Iraq/perception
  - Reference B
- Tobacco treaty
- Reconstruction in Iraq/NGOs
- North Korea



**VIDEO** Multimedia

Press Briefing
📄 view
🔊 listen

12:32 P.M. EDT

MR. FLEISCHER: **Let me give you a President's** schedule today, and then I have several announcements for you and a statement by the President I'd like to read to you.

The President began with an intelligence briefing, then an FBI briefing. And then he convened a meeting of the National Security Council. The President also met for 45 minutes earlier today with the elected leadership of the Republican House and the Senate to talk about a series of actions that are pending on the Hill, including the growth and tax plan to create jobs, the importance of getting prescription drugs to senior citizens, the global HIV-AIDS initiative, energy legislation, and a number of other areas they talked about. The President also made

remarks, as you know, to the 2003 National and State Teachers of the Year.

Later today the President will have lunch -- or he's actually having lunch now with the Vice President. He will also welcome Congressman Rob Hall to the White House on the occasion of the Congressman's 80th birthday. And then later today, the President will sign into law the National Amber Alert legislation. He will welcome to the White House the families of many of those cases, prominent cases where children have been missing. And later this evening, the President will meet with the President of Colombia in the Oval Office.

President Bush will also welcome Prime Minister Kjell Magne Bondevik of Norway to the White House on May the 16th. Norway is a close ally and good friend of the United States, and the President and the Prime Minister will discuss important challenges on the global agenda, including the war on terrorism, reconstruction of Iraq, and the transatlantic relations.

I have a lengthy statement I want to read to you by the President, which will be distributed immediately after the briefing, on the release of the road map in the Middle East. This is a statement by the President:

**On March 14th, I noted the important** steps taken by the Palestinian Legislative Counsel toward the creation of an empowered, accountable office of Prime Minister. The PLC has now confirmed a new Palestinian Prime Minister and cabinet. Today the road map for peace, developed by the United States over the last several months in close cooperation with Russia, the European Union, and the United Nations, has been presented to the Israelis and to the Palestinians.

The road map represents a starting point toward achieving the vision of two states, a secure state of Israel and a viable, peaceful, democratic Palestine, that I set out on June 24, 2002. It is a framework for progress toward lasting peace and security in the Middle East. Implementing the road map will be dependent upon the good-faith efforts and contributions of both sides. The pace of progress will depend strictly on the performance of the parties.

I urge Israelis and Palestinians to work with us and with other members of the international community, and above all, directly with each other, to immediately end the violence and return to a path of peace, based on the principles and objectives outlined in my statement of June 24, 2002. Both Israelis and Palestinians have suffered from the terror and violence, and from the loss of hope and a better future of peace and security. An opportunity now exists to move forward.

The United States will do all it can to seize this opportunity. To that end, I've asked Secretary Powell to travel to the region to begin working with parties so that we may take advantage of this moment."

End of statement. That will be released in print to you immediately following the meeting.

**And, finally, yesterday, Senate Democrats** announced that they will filibuster another one of President Bush's very qualified nominees -- in this case, Texas Supreme Court Justice Priscilla Owen, who is the nominee for the 5th Circuit. Miguel Estrada has also been the subject of a Senate filibuster. They were both originally nominated on May 9, 2001, and have been waiting almost two years for a vote. Both were rated well-qualified from the American Bar Association. That is the highest possible rating that the American Bar Association gives. It is also, according to Democrats, the gold standard that they would use to judge whether nominees were qualified. Both enjoy strong bipartisan support within their states. Both have majority votes available, bipartisan, on the floor of the Senate if the obstruction were to cease.

The Senate has a constitutional responsibility to hold an up or down vote on all judicial nominees within a reasonable amount of time. But some Democrats have abandoned that responsibility in favor of partisan politics and obstructionism. The Constitution is clear: A majority is required to confirm judicial nominees. A minority of Senate Democrats are effectively changing the law with their obstructionist tactics. The President's nominees are highly-qualified and not only do they deserve a vote, they deserve to be confirmed. The President again calls on the Senate to end these obstructionist tactics and to allow a vote on these two nominees.

And with that, I'm happy to take questions. Helen.

Q **What has been the original** -- not original -- initial reaction to the road map?

MR. FLEISCHER: Well, it's just been received this morning. I would allow the Israelis and the Palestinians to speak for themselves and not express their thoughts for them, they're capable of doing that. From the President's point of view, he welcomes their contributions to this, whatever ideas they have, and he looks forward to working with them on it.

The State Department can give you information about the Secretary's itinerary, future travels. It's not an immediate trip that the Secretary will be taking, but the United States, the President, and the Secretary of State will devote considerable time and energy to helping the parties to achieve peace.

Q **What does he hope to accomplish when** he goes to Syria?

MR. FLEISCHER: I would refer you directly to the State Department on it, but the message to Syria is that Syria is a terrorist country, that Syria has supported terrorists, Syria occupies a considerable portion of Lebanon through the Hezbollah, and Syria needs to reassess its role in the world. We hope that Syria, under the relatively new leadership of a relatively untested leader, will choose a different direction than it has in the past. Syria also -- it's important that they continue to receive the message that they have been receiving in regard to not harboring anybody who is trying to leave Iraq.

Q Does the President support the idea of lifting sanctions against Iraq, vis-a-vis its status as a terrorist state?

MR. FLEISCHER: Yes, and Secretary Powell discussed that up on the Hill today. Iraq no longer is a terrorist state. The chief terrorist and his cronies have been removed.

Q **How quickly can you lift** the sanctions?

MR. FLEISCHER: Through the United Nations you're asking about?

Q No, no, no, terrorist state.

MR. FLEISCHER: That's, I believe -- I don't know if that's a legislative matter or an administrative matter, so I'd have to refer you to the experts at State for that.

Q **You're saying now the President** was trying to build up support for his tax cut with the Republican leadership. Alan Greenspan was on the Hill again expressing opposition to it, saying --

MR. FLEISCHER: That's not what he said.

Q He said his position hasn't changed --

MR. FLEISCHER: That's correct.

Q -- since he testified the last time. The last time he was not encouraging it when it passed. Does the President --

MR. FLEISCHER: That's not a fair characterization of what the Chairman has said about the question of providing tax cuts. He has had a very nuanced statement about it, but certainly he never said he was opposed to it.

Q He's expressed that this is probably not a good time to pass a tax cut of that magnitude, is my understanding of what he said.

MR. FLEISCHER: You have to take a look at what he said in its entirety, because he has expressed his concerns about spending and he has said that tax cuts have a stimulative effect on the economy, and he has expressed support for stimulus of a nature of the tax cut, without defining specifically what should be in it. So, again, I think you have to take a look at what he said in its entirety, but that's not a fair characterization.

Q Does the President feel that his case is somewhat undercut by the Fed Chairman's position, especially since the Fed Chairman, as the President suggested he will reappoint him --

MR. FLEISCHER: No, because that's not the Fed Chairman's position, as you've expressed it. So, no.

Q **Can I go back to the road map** and Helen's question? There has already been some initial reaction. Abu Mazen, the Palestinian Prime Minister, has said he would accept it with no changes. The Israelis have suggested about a dozen changes they would like to see to the document, itself. Is the administration encouraging the Israelis to accept it as is, or are you willing to play with it a little bit to make whatever changes the Israelis want?

MR. FLEISCHER: Well, now the difficult process begins again, in terms of finding a way for the parties who have differing approaches to come together. And what the President is hopeful is there's been such a changed environment because of the last several years, a new, more optimistic, more hopeful environment can take hold.

And so we received preliminary comments from the Israelis; the document has now been formally released to the Israelis. And as the President said, we welcome their contributions to the document. The Palestinians have made similar preliminary comments about it. We look forward to hearing more detailed comments.

If the current comments hold, then it's no surprise, the work will begin of trying to help the Israelis and the Palestinians to bridge their differences about the document. What's important is that they both share the outcome of the document, which is the path to peace and the path to statehood for Palestinians, and security for Israel.

Make no mistake, it will be hard work. There will be a lot of hand-holding required. The President is prepared to invest the time and the energy into it. Still, it does fundamentally come down to the two parties. But nobody would expect that the initial comments one hour after release is going to be the final comments.

Q But fair or not, there has been somewhat of a perception up until this point that the President wasn't really committed to this. Is there a -- well, not willing to send the Secretary of State to the region and show the level of commitment we're seeing now, after the war in Iraq. Is it fair to say that the success in Iraq has given Israel another level of security so that the administration would expect them to be willing to make the sacrifices that both sides are needing to make in order for this to work?

MR. FLEISCHER: I think two points; one is the biggest holdup was the fact that Yasser Arafat was still in charge of the Palestinian Authority. The administration was unequivocal; President Bush said repeatedly that the road map would be released upon a confirmation of Abu Mazen's cabinet and as reforms in the Palestinian Authority move forward. That just took place this very week. So the administration has been timely in its release of the road map.

The fact that one of the lead sponsors of violence has been removed from the scene, Saddam Hussein, is an important piece of the prospects for peace in the Middle East, but it's not the only one. Certainly, there are indigenous issues between the Israelis and the Palestinians. There are root causes of violence and historical differences between the Israelis and Palestinians that have to be resolved, that are, indeed, separate and apart from a successful completion of the war. But make no mistake, the fact that Saddam Hussein has been removed from power does remove one source of instability that paid for suicide homicide bombers to cross into Israel and take innocent lives.

Q When does the President expect to see results as the road map lays out the mutual steps that each side should take, the cracking down on militancy and freeing up of the hold that Israel has had on the Palestinian community?

MR. FLEISCHER: It's a process. And the process began this morning as the parties formally received the road map for the first time in the formal sense. From here, it will be a question now of the willingness of the parties to face a different type of future; the willingness of the Palestinians to forego violence as a way of settling disputes; the willingness of the Israelis to reach out and work with the Palestinians to resolve political disputes, land disputes, and enter into a permanent era where two states can live side-by-side. And that process will now move forward.

I'm not going to put an artificial time on any one element of that process. Certainly not today, the day the plan has just been released to them. But hopefully, today will mark the beginning of a new way of doing business between the Israelis and the Palestinians, with the release of the road map which focuses them on peaceful settlement of disputes, not violent settlement of disputes.

Q **And to follow up on Tom's question** on Greenspan's comments. He wasn't only focusing on the problem of spending. He was saying long-term deficits will impact long-term interest rates, and he said that while he has favored a dividend tax cut, he believes it's very important that there's a pay-as-you-go or discretionary spending restraint in order not to increase the deficit. And the Congressional Budget Office is saying this tax cut and the spending together will cause deficits long, far into the future. Doesn't that undermine the case of a tax cut?

MR. FLEISCHER: Well, the President believes very strongly that we need to reduce the deficit. His budget focuses on doing that. But the President also is very concerned about the state of the economy here and now, today, for the unemployed, for people who are looking for work and can't find it. And certainly, as unemployment still is at about a 5.8 percent level, what we've seen increasingly is people who are leaving the labor force and not even looking for work, which doesn't show up in the unemployment statistics.

The President has a lot of concern about those families, those people who want a job. And there are different issues to be approached, they're both important, about how to make sure there is no deficit. But his first focus is helping people to find a job. And he knows we can reduce the deficit over time. He also knows that the best way to reduce the deficit is to hold the line on spending. And he's very pleased that the budget resolution that was just passed does have a good, tight control over domestic discretionary spending. And the meeting the President had with congressional leaders today, they did talk about adhering to the spending discipline of the budget resolution.

Q So you disagree in the emphasis that Chairman Greenspan has put on get control of the deficit before you do anything on spending or taxes?

MR. FLEISCHER: The President wants to focus on growth, on creation of jobs for the American people, and on deficit reduction.

Q **And then, on the judicial nominations**, where precisely in the Constitution is the Senate required to hold an up or down vote on every judicial nominee?

MR. FLEISCHER: I said that the Constitution is clear, a majority is required to confirm judicial nominees. The Senate process has now moved to a point where it's becoming almost a matter of routine --

Q You said that they were required to hold an up or down vote.

MR. FLEISCHER: I said, the Constitution is clear, a majority is required to confirm --

Q Just prior to that, you said that they are required to hold an up or down vote.

MR. FLEISCHER: You can check the transcript, but when I cited on the Constitution, I said just what I said verbatim on the Constitution.

Q Ari, what would the President like to see the Israelis and the Palestinians do first, now that the road map has been presented?

MR. FLEISCHER: The President would like to see them study the road map. We'd like to see them demonstrate a willingness to work with each other to bridge the differences between their opening points of views about the road map. And he would like to see the Palestinians provide security so that homicide bombings are, indeed and in fact, stopped; a crackdown by the Palestinian Authority on those who would seek to oppose peace from within Palestinian ranks. And the President would like to see the Israelis work with the Palestinian Authority to promote political agreements and political settlements of disputes.

Q What about settlement activity?

MR. FLEISCHER: Absolutely, the President believes that as security is improved, settlement activity must stop.

Q How much personal time will the President invest in this? And do you see an early Middle East conference?

MR. FLEISCHER: I'm not going to speculate too far down the line. As the President says in his statement, Secretary Powell will travel to the region shortly, so there will be any number of opportunities to have conversations. You may want to talk to the Secretary about any contacts he may have had today in the region.

The Secretary is working the phones. This is important. And this administration, this President are dedicating to helping the parties find a new way.

Q And his own time?

MR. FLEISCHER: The President?

Q Yes.

MR. FLEISCHER: Absolutely, he's going to spend considerable time on it. And I want to remind you that in the run-up to the war, in many of the meetings the President had, he always brought up the subject of Middle East peace with European leaders. And the President has invested considerable time with Arab leaders in the region, working to advance peace between the Israelis and the Palestinians, which also is another hopeful sign, because there are Arab nations in the region that would like to see progress be made and are working, actually, very diligently and quietly to help achieve those goals.

Q Republicans on the Hill are talking about a variety of mechanisms or gimmicks, some might call them, to keep the size of the tax cut down to a level that can pass the Senate. Among them is making some aspects of this temporary. Would the President be prepared to accept a tax cut package that made, for example, the dividend exclusion temporary or less than 100 percent?

MR. FLEISCHER: Well, there are a number of ideas that are now starting to publicly float off of Capitol Hill. I anticipate that there will be a markup in both the Ways and Means Committee and the Finance Committee next week, and so, obviously, this will come to some form of a concrete proposal prior to that. And that's one of the reason the President met today with the leadership. He'll have continued conversations. He's spoken with the leaders; many meetings took place.

And I'm not going to be able to negotiate the President's position publicly, but there are a variety of different ways when it comes to tax policy to achieve the President's goals and the President is going to work productively with the Congress to find those ways.

Q So he's open to these kinds of ideas?

MR. FLEISCHER: I'm not going to negotiate in public, but there are a good variety of ways to accomplish all of the objectives of the President's proposal -- including a 100-percent dividend exclusion.

Q **You talked a moment ago about the** problem of unemployment being an immediate problem and suggested that the deficit is something that would have to be dealt with a little bit further down the road. At what point does the deficit become an immediate problem? It's reaching levels that some economists say over the next year or two could even be 5 percent of GDP, which is typically a level at which other countries would be told they have a huge, major, immediate problem.

MR. FLEISCHER: Well, first of all, the trend line in the deficit is that it is going down. Second of all, you have to examine what caused the deficit. And it still remains numerically and empirically the fact that the deficit has been caused by the recession that took place beginning in January of 2001 as a result of the slowdown in the economy that began in the summer of 2000, or the stock market decline, which began in March of 2000. That, combined with the September 11th attacks and the war and the subsequent spending required to fight the war and to react to September 11th, is what caused the deficit.

That is empirically the case. Even if there had been no tax cut, for example, we would still have a deficit today, without the tax cut. So first things first is what caused the deficit. And clearly, the international situation, as it increasingly improves, helps to reduce the deficit.

But the greatest factor is the economy is emerging from a recession. Nothing hurts revenue growth more than a recession. And what's particularly interesting to note is that the greatest source of revenues from the dramatic upswing in revenues in the late '90s was something that people started to refer to as the market factor. The dramatic surge in the stock market led to a dramatic surge in revenues. And so much of this was the result of factors that are now increasingly fading from the economy. We hope the deficit will react to this.

Q But this, again, is $400 billion, $500 billion an acceptable level for this economy?

MR. FLEISCHER: Well, clearly, when it comes to fighting the war, whatever it took to fight the war was necessary to protect our force, to protect our troops and to achieve our objectives. The war is now -- as the President has said, the major combat operations -- the President has been told major combat operations have ended. So all these factors, the recession and the war and 9/11, have helped to drive the deficit to where it is.

Q **Ari, critics are saying that the** atmosphere for this road map would have happened earlier if President Bush would have sat down with Yasser Arafat a long time ago.

MR. FLEISCHER: No.

Q Why?

MR. FLEISCHER: Because Yasser Arafat was not a party to peace. Yasser Arafat was a part of the problem. I think Yasser Arafat had his chance and he walked away with it -- walked away from it when he walked away from an agreement that President Clinton worked very hard to reach. That was Yasser Arafat's moment of truth. And then the moment of truth became even worse when Yasser Arafat lied to President Bush about the Karine-A and actively worked on behalf of the terrorists, lying to the President of the United States about Palestinian support, led by Yasser Arafat, for terrorism.

Q But once again, the critics are saying Yasser Arafat was reaching out. The White House has said he talked to Colin Powell and talked to other people instead of President Bush. Do you think that interaction with two leaders could have helped at all in anything, resolve any type of --

MR. FLEISCHER: I think the best, most accurate way to describe Yasser Arafat's manner of reaching out was he reached out to terrorists to import weapons for the Palestinian terrorists. That's what the lesson of the Karine-A was.

Q **Another thing, on another subject.** The NRA, Charleton Heston has left. Many are wondering about a statement that was said that the assault weapons ban will not continue once it expires. The administration has said something different. How is this meshing with a group that is friend to the Bush administration?

MR. FLEISCHER: I think the administration is already on record about the assault weapon ban. The President has said that he supports the current assault weapons ban, and he would support the reauthorization of the current assault weapons ban.

Q So the NRA is just out in left field then?

MR. FLEISCHER: The President approaches every issue on the merits of the issue. Sometimes he agrees with different people on different issues, but I think when it comes to virtually all the issues that have been presented, the President has strong agreement with the National Rifle Association. The President's position on the current assault weapons ban is known.

Q **Ari, tomorrow the President is going to announce** that major combat operations are over in Iraq. At what point is it appropriate criteria to meet -- to legally declare that the war with Iraq is over, and in doing so, under international law, meet requirements as an occupying force?

MR. FLEISCHER: Well, number one, as the liberators of Iraq, the administration has, you should note, been releasing POWs. The administration continues to address exactly what the President promised, the security concerns, the health and the welfare concerns of the Iraqi people. All that continues.

I can't make a prediction about the legal matters, about when, from a formal, legal sense, hostilities will be deemed to be over. That will be something the President, again, gets guidance from, from the commanders in the field. So that will be driven by events on the ground, and the reaction of the commanders on the ground to those events.

Q But why isn't this the time to legally declare that it's over?

MR. FLEISCHER: Because as events are very visible, as you all have covered this morning, hostilities remain. There are pockets of resistance. There continue to be Iraqis who shoot at America's Armed Forces. It happened again in Fallajah.

Q **Can you speak to the significance of the capture of** the al Qaeda, half a dozen out of Pakistan, one believed to be responsible for perhaps the bombing of the USS Cole?

MR. FLEISCHER: It's been another strong day of Pakistani cooperation in the war against terror, with a helpful and significant capture. And the President is appreciative to President Musharraf and the Pakistani people for their continued strong efforts to fight terror.

Q Is there any information on this alleged handwritten note from Saddam Hussein in this London Arabic paper, whether it's legitimate or authentic?

MR. FLEISCHER: I have no way -- I've received no evaluations from it. You can take it for what you want.

Q **Ari, on judicial nominations, it seems** the issue is utterly gridlocked. Does the President have some ideas of how to get this thing kind of moving again, beyond just having tantrums?

MR. FLEISCHER: The President will continue to speak out and make the case. He will continue to stand strong, shoulder-to- shoulder, by his nominees, because he believes they are qualified. But if you really want to measure what's going on here, I think you have to measure the will of a bipartisan majority versus the role of a slender obstructionist minority. And that's the problem when people want to employ the 60-vote device that the Senate makes available to its members to force their ideology on a majority.

And what's happening now is that there are a few liberal Democrats who want to enforce their ideology on a bipartisan majority that can govern, that can appoint judicial nominees. There are a bipartisan majority of votes for Priscilla Owen. There are a bipartisan majority of votes for Miguel Estrada. They are being blocked and obstructed by a liberal, partisan, obstructionist minority.

Q **Why is the President giving this** speech now? What significance should we read into this?

MR. FLEISCHER: Well, the President is giving the speech now because of the successful operations that have been carried out, the significant accomplishments in achieving the mission, and because he wants to explain to the American people, having risked lives and treasure in pursuit of our goals in Iraq, what the present results are. And that's something that the President began with his speech to the country about, and he wants to, again, now bring it to a conclusion with a speech to the country. The war on terror will continue. Iraq was a phase in the war on terror. And the President wants to discuss all of this with the American people.

Q Why not just declare victory?

MR. FLEISCHER: Well, I would urge you to listen to the President's words tomorrow night. But the President knows that while major combat operations have ended, and while the next phase has begun with the reconstruction of Iraq, there continue to be threats to the security and the safety of the American people. And he will describe that. There continues to be great progress in protecting the American people from those threats. But threats do indeed remain.

Q Full victory, you've indicated before, I believe, would include all of the President's objectives having been met, including finding weapons of mass destruction and rounding up all the leadership of the previous regime. Is that --

MR. FLEISCHER: Well, I'll let you judge the President's words tomorrow for what they represent, what topics he covers. Certainly Deputy Secretary Armitage's speech this morning about weapons of mass destruction covered much of that ground.

Q But the President's not going all the way.

MR. FLEISCHER: Again, I'll urge you to listen to his remarks tomorrow, and you'll form your own basis.

Q One other thing. Do this have -- do his remarks have any legal impact whatsoever?

MR. FLEISCHER: No, the remarks tomorrow will be -- as the President has a habit of doing -- speaking in direct, plain English to the American people, so they can understand what was at stake, what has been accomplished, and so we can all join together in saying thanks to the men and women of our Armed Forces who helped achieve this remarkable success with so little loss of life. From a legal point of view, the remarks tomorrow do not change any legal matters.

Q Getting **back to the Greenspan testimony**. Greenspan, as Terry pointed out, has said he would like to see offsets for any dividend tax cut. You all did not propose offsets. So getting back to Tom's question, do you think that his testimony today, in the way of not changing his position, has undermined you all's argument on the Hill to pass the dividend tax repeal without offsets?

MR. FLEISCHER: No, I think that members of Congress always enjoy and benefit from hearing from Chairman Greenspan. They use their own independent judgments. And we are -- the President remains confident that at the end of the day a majority will be assembled in the House and the Senate to pass his proposals.

Q Does the President intend now to get -- he's obviously shown that he's -- in the last two meetings, he is getting more personally involved. Are we to see more of that, when it comes to the tax plan?

MR. FLEISCHER: Well, the President has long been directly and personally involved, and he will continue to be. The President met for an hour and a quarter on the Truman Balcony last night with the Speaker of the House and the Majority Leader of the Senate. Then he had the 45-minute meeting today with the elected leadership. I think you can anticipate the President will travel the country to continue to make his case. He will continue to work the phones and meet with members.

Q Did he, in either of those meetings, give the leadership of Congress some insight into whether he wants phase-ins, he would accept phase-ins --

MR. FLEISCHER: No, they didn't get into that level of detail.

Q Why not?

MR. FLEISCHER: Because it's not that type of meeting. They had a broad agenda to cover, including prescription drugs for seniors, Medicare --

Q But aren't we at the point where -- the committees about to meet, these decisions will be made soon. So when will the President tell them what he would like, how he'd like those decisions --

MR. FLEISCHER: It's all part of a process that involves the President, that involves others in the administration working directly with Chairman Thomas and Chairman Grassley, as well as the leadership. So I think you can anticipate that process will continue between now and when the markup is revealed.

Q **Two questions. One a follow on** your colloquy with Terry. Your exact words at the top were, "The Senate has a constitutional responsibility to hold an up or down vote."

Q Thank you.

Press Briefing by Ari Fleischer

Page 10 of 15

Q Are you now walking yourself back from that, and saying that you didn't mean to say that? Or are you saying that there is -- are you saying that there is something in the Constitution that requires the Senate to hold an up or down vote on every judicial nomination?

MR. FLEISCHER: I said -- you're correct, I said, the Senate has a constitutional responsibility to hold an up or down vote on all judicial nominees within a reasonable time, and that's because advice and consent is the prerogative of the Senate, and it is to be given.

Q Prerogative of the Senate. They're a co-equal branch of government that interprets their own constitutional responsibility.

MR. FLEISCHER: Clearly, if the Senate made the decision that they do not want to seat anybody in the federal court system, it would be a constitutional crisis.

Q That's not the decision they're making.

MR. FLEISCHER: But there is a vacancy crisis in the Senate. It is uniquely the role of the Senate, under the Constitution, to confirm judges. And if the Senate engages in filibusters for the confirmation of judges, then clearly the nation would not be well served.

Q The question is, is there something in the Constitution that requires an up or down vote on every nomination, because as you know, there are many judicial nominations that --

MR. FLEISCHER: Only the fact that if the Senate doesn't do it, nobody else will. And so, therefore, the President calls on the Senate to exercise its constitutional prerogative to confirm his nominees.

Q But it's not in the Constitution, correct? There's nothing in the Constitution --

MR. FLEISCHER: They have a responsibility to hold an up or down vote. Nobody else, other than the Senate, per the Constitution, has that responsibility. Now, it is certainly the right of the Senate to walk away from their responsibilities. But I don't back off at all from saying that under the Constitution, the Senate has that responsibility.

Q That's different from saying they have to hold an up or down vote on every nomination --

MR. FLEISCHER: They have a responsibility to hold an up or down vote.

Q It all depends on what your definition of the word, "responsibility" is.

Q **On Iraq, the United States went to war** -- this administration went to war in Iraq for the very specific reasons that the President is very clear. One of them was weapons of mass destruction. One of them was alleged links between Saddam Hussein's regime and terrorists. A third reason which the President stated many times was that Iraq's military strength and Hussein's use of it posed a threat to its neighbors in the region. We're now, as you say, at the end of major combat operations. No significant finds of weapons of mass destruction have been found to date. No significant evidence has been found linking Saddam Hussein's regime to al Qaeda beyond what we knew at the start of this war. And Saddam Hussein's military looks like -- hardly looks like a threat to anyone.

Is the President going to address this in his speech tomorrow? And beyond that, is there any sense of embarrassment in the administration that the three major prongs of a policy haven't, at least as yet, haven't really been --

MR. FLEISCHER: Heavens no, on your last point. And certainly the President has said, and you've heard him say it many times, that we continue to have high confidence that the weapons of mass destruction will be found. Iraq is a regime that was a master at hiding it, and there are thousands and thousands of sites where it could be hidden, and they will be pursued as increasing evidence comes along.

On the ties to al Qaeda, I think that's been well-documented and known. And when you talk about the military threat, they may not have been much of a military threat for our Armed Forces as the war was engaged, but for the neighborhood, they were one powerful military threat, and they proved that by attacking their neighbors multiple times.

Again, tomorrow the President will give the speech, and you'll be able to hear it all in its entirety.

Q **Ari, going back to the Middle East, is** there any plan by the President to nominate or name a new Middle East envoy to the peace talks?

MR. FLEISCHER: Nothing that's crossed my radar.

Q General Zinni, is he still the Middle East envoy?

MR. FLEISCHER: Let me try to get an update on that. Nothing has crossed my radar, though.

Q **Ari, back on the judicial nominations, now.** A new controversy may be cropping up because the two Maryland senators are concerned about the Claude Allen nomination. Grant you, they might not have voted for Owen and Estrada anyway, but they're upset about the Claude Allen nomination because he's a Virginian, and they consider that to be a Maryland seat on the 4th Circuit. Does the President have any feeling of obligation to hold to those kinds of gentlemen's agreements?

MR. FLEISCHER: Well, we always try to work with various changing types of requests from senators for consideration. And it's a process that we try to work very collegially with the Senate. So we'll just continue to work on behalf of all the President's nominees with all those involved.

Q Would he not consider that to be a Maryland seat?

MR. FLEISCHER: Let me take a look at the specifics of it to see if I can offer you more on it.

Q Back on the road map, isn't the goal to have the first phase completed by next month? And is that really a realistic expectation considering that you're calling for Israeli withdrawal from Palestinian occupied territories?

MR. FLEISCHER: Well, the framework and the road map does outline certain time periods, the key one being the creation of an independent Palestinian state in 2005 that lives in peace and security with their neighbor, Israel. And all events leading up to that help to support that goal. What's going to happen now is we'll see how actively and how quickly the parties can work together to make all of this happen. We'll see what the exact time table is.

Q So you're not necessarily firm in the insistence that Israel withdraw by next month?

MR. FLEISCHER: Today is the beginning of the process. And let's wait and hear how the parties react to it. Let's see what efforts they undertake. And we're going to continue to work with them toward the achievement of those goals.

Q Was the deadline always the end of May, or was that changed because of the delay in the appointment of Abu Mazen?

MR. FLEISCHER: No, I don't -- this road map was prepared late last year, and it was released today as is from late last year. But this is where we welcome the contributions from the parties to it.

Q **The visit to the ship tomorrow,** can you describe some of the logistics for us, and tell us if the President is looking forward to or dreading his first carrier landing? (Laughter.)

MR. FLEISCHER: The President is eagerly anticipating this trip. I think he's very excited about the process of being directly with many of the sailors and the Marines who helped make the success of the mission possible. He's also looking forward to addressing the nation from the deck of a moving aircraft carrier. That's a wonderful

metaphor for the return of our troops from combat back to their families.

The President will fly out to the aircraft carrier on Navy One, after he departs Air Force One, lands in San Diego and then transfers. And it's a very exciting voyage, a very exciting trip, but nowhere near as exciting as the voyage that the sailors and the Marines are taking, because they're coming home to see their families.

Q Obviously, the President's a former pilot. Can you talk about the plane itself and where he's going to be?

MR. FLEISCHER: The President will be sitting in the front seat, next to the pilot of the Navy aircraft. He is a former pilot. For the sake of the landing, I'm sure he will be doing no piloting. (Laughter.) I hope he's not watching today's briefing. (Laughter.)

Q **Ari, two more Colombian journalists** have been assassinated in Colombia. What does the President plan to do to try and restore security in that country?

MR. FLEISCHER: The United States is working directly with the Colombians. And we have a presence in the region authorized by the Congress to help with the narco-terrorist war that the government of Colombia and President Uribe are fighting. The President looks forward to his meeting this evening to talk to President Uribe about the steps that are being taken to fight the terrorism there. And it's important. The people of Colombia have been long -- long been struggling against terrorism there. That's sapping the strength of the country, and they deserve the support of the world.

Q The press secretary in Doha says U.S. forces will be leaving Saudi Arabia by the end of the summer. Will this improve U.S.-Saudi relations?

MR. FLEISCHER: Number one, U.S.-Saudi relations are strong. Saudi Arabia is an ally of the United States, has been a partner with the United States. And that is how this President views our relationship with Saudi Arabia. As for any type of military deployments or basing issues, you need to talk to the Department of Defense for the specifics of them. We regularly review and are undergoing currently a review of our deployments worldwide.

Q **I'd like to follow up on my question** from yesterday about reports of French aid to Saddam's regime. Is there anything new on that, or our relationship with France in general?

MR. FLEISCHER: Well, on the reports, I've noticed many of these reports, different accounts, some relating to documents that were found in Iraq, and I have nothing to offer on that. I think it's something that the French can answer to explain any relationship. That's for France to address.

Q In his Sunday column, Tom Friedman cited the atrocities that occurred in Iraq, and said, "We do not need to find any weapons of mass destruction to justify this war." Does the President agree with that sentiment?

MR. FLEISCHER: Well, the President is confident that we're going to find weapons of mass destruction. So I think it's not an immediate relevant issue to the President because, based on everything that he knows going into the war, he has continued to express that confidence.

Q **And a follow-up. You've** said earlier that -- he used the word "embarrassed," but you indicated that the President is not concerned that a lot of things have not occurred yet, the finding of the weapons of mass destruction. Yet, there does seem to be a feeling in some places, particularly Europe and some of the Arab countries, that the President may have intentionally deceived the public by overstating the threat posed by the Iraqis. Are you at least concerned that this perception is rising in some areas?

MR. FLEISCHER: The statue fell just three weeks ago. And Saddam Hussein has had some 14 years in which he had worked to hide his weapons of mass destruction, and in particularly the four years when the inspectors were out of the country. And so, no, this is not a serious issue or a credible issue. This is an issue that will be addressed over time, and with confidence, because it will be found.

Q **Ari, you talked about Yasser Arafat** and the President's view that he was an impediment for peace. Under the road map, what future is envisioned for Yasser Arafat?

MR. FLEISCHER: The future envisioned for the road map is for the Palestinian people and the Israeli people. And there's a place for all those who will live in peace, and the work to be done by those who believe in peace will be done by others, because he had his chance, he failed to take that chance to lead the way for peace.

Q His day is done?

MR. FLEISCHER: I think that you can refer to what the President said on June 24th, 2002 about his role.

Q **Can I just ask you about the speech tomorrow**, Ari? You said he's not going to say the war is over, but is there not some element of victory inherent in his speech?

MR. FLEISCHER: You know, I've gone probably as far as I can go this far in advance of a speech. The President will address it in its entirety tomorrow.

Q On Iraq, how are you assessing the validity of the statements by Tariq Aziz regarding Saddam Hussein, and regarding Scott Speicher? And do you have any theory on the whereabouts of Baghdad Bob?

MR. FLEISCHER: Well, I'm not going to comment on any of the reports about what we are hearing in the course of our interrogations. Just as a matter of policy, this is not something that we discuss. And Baghdad Bob -- which Baghdad Bob? (Laughter.)

Q The one that wants to replace you if he gets a chance. He's the Information Minister in Iraq.

MR. FLEISCHER: Oh, I wasn't aware. No, I don't -- I have not heard anything other than the President's flavorful description of him.

Q What do you see as the impact of Hamas' rejection of the road map and the latest suicide bombing on prospects for what you described as a new and more optimistic environment? How can such an environment take hold in that kind of an atmosphere?

MR. FLEISCHER: This is the very challenge that the parties face. Hamas, violence, homicide attacks, and the other terrorist groups that operate in the region are the greatest challenge to peace there is. And this is why it's so imperative for the Palestinian people to join together and say that if they want to be a state, if they want a bright, peaceful future, security has got to be brought under control, and these groups have got to be brought under control. Because this type of terrorism is a setback to the cause of the Palestinian people, and a setback to statehood. And that is one of the biggest sources of trouble and concern.

And so, security becomes very quickly an important point in events on the ground and the ability of Israelis and Palestinians to work arrangements and work agreements. The President will continue to fight for this. And it's important now for the Palestinian Authority to take every step possible and to crack down so these type of terrorist attacks cannot be repeated.

Q Do you think this emerging government has a capacity to bring them under control?

MR. FLEISCHER: They certainly, per the Oslo Agreement, per statements that have been made, and per a sense of desire for peace, have an obligation to take every step in that direction, yes.

Q **A different topic. The tobacco** treaty at the U.N., the U.S. wants some changes to it that critics say will weaken it significantly. What's the administration's --

MR. FLEISCHER: Well, this is this is -- if ever there was an issue involving standard language in treaties, this is it. We wanted to be a signatory to this treaty. We have made clear that we want to sign it, we want to ratify it. The language here deals with what's called the reservations clause, which is a standard procedure in treaties. And this reservation -- the reservation clause simply prohibits signatories from making reservations of sections of the treaty. Reservations is a standard part of treaties. So you really haven't seen anything different in our approach to this treaty. It is a treaty we want to sign, we want to ratify with the standard language.

Q I have a question regarding the French papers reporting on chemical weapons in Iraq. They are saying that so far there is nothing there, and the troops there want to find anything. And if they find something, the French media is saying the CIA has -- is going to put it there. Do you have any response to this kind of --

MR. FLEISCHER: Well, just again, I've addressed here earlier, the President has high confidence that it will be found. A mere three weeks after the fall of the statue, it's unreasonable to expect that a decade of Saddam Hussein's ability to deceive and to deny and to build up a giant infrastructure built to hide, can be pierced in three weeks time. Again, Secretary Armitage addressed this at some length this morning.

Q **Ari, now that we're entering phase two** in the Iraqi situation, what is the United States' position on the United Nations and NGOs taking a stronger, or more up-front role in the reconstruction process? Do we still want to have the major say?

MR. FLEISCHER: Well, as a technical matter, it's referred to as phase four. Phase three was the military phase. Phase two was the lead-up phase. I don't remember what phase one was. (Laughter.) But the President believes that the United Nations should have a vital role in reconstruction efforts in Iraq and the humanitarian relief programs in Iraq. And that's important. The United Nations is a major representative to the deliberations inside Iraq.

And I would note that USAID in its granting of contracts, is granting contracts to NGOs who are helping to improve the security situation and the humanitarian situation inside Iraq.

Q Ari, will we defer to the United Nations, though, in terms of what projects to pursue and all that, given the fact that they never supported the war?

MR. FLEISCHER: The lead will continue to be the coalition with the help of all those who want to play a constructive role, including the United Nations.

Q The Washington Post quoted the Associated Press' corporate spokesman, Jack Stokes, in New York as saying with regard to their interview of Senator Santorum, "Any of our reporter's marital status has nothing to do with their stories." And my question is, do you, as the President's chief media spokesman, believe that there would be no conflict of interest seen if AP hired that brilliant writer Lynne Cheney to be their White House Bureau Chief, or to cover Senator Kerry's campaign?

MR. FLEISCHER: Lester, I think these are matters that the media wrestles with, and it's appropriate to let them handle it, not the White House spokesman.

Q The Council on American-Islamic Relations has asked the President to rescind the nomination of Dr. Daniel Pipes to the U.S. Institute of Peace. Does the White House regard this organization with enough respect to withdraw Dr. Pipes' nomination?

MR. FLEISCHER: The nomination continues to stand.

Q **Ari, North Korea has mentioned any intervention** attempted by the United Nations with North Korea nuclear issues will be regarded as a prelude to the war. What is your comment?

MR. FLEISCHER: Well, that's, frankly, absolutely nothing new for North Korea. North Korea has had a history of saying inflammatory statements. In fact, they said that very statement on -- in 1994. So this is a pattern that North Korea has about engaging in rather hot rhetoric, and it does not contribute to advancing the cause for peace on the Peninsula.

Q **Does the President view his speech tomorrow night** as an opportunity to inform the nation about -- specifically about the future course of the war on terrorism, and exactly what his intentions might be towards the other members of the axis of evil?

MR. FLEISCHER: Let me just repeat what I said earlier. The President will talk about the ongoing war against terrorism in his speech tomorrow night.

Thank you.

END 1:19 P.M. EDT

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2003/04/20030430-10.html

 CLICK HERE TO PRINT

# Exhibit E


**U.S. DEPARTMENT of STATE**

## Roundtable with Traveling Press

**Secretary Condoleezza Rice**
London, England
January 18, 2007

Secretary Rice Travel to the Middle East and Europe

**SECRETARY RICE:** All right, let me just take a couple of minutes to wrap up the trip and then a few questions. As you know, I came out during this trip to do a couple of things. First, it was important to spend some time with the regional states concerning the President's plan for Iraq and I had an opportunity to talk to people in more detail about what the thinking was, why the decisions have been taken that have been taken, I think to lay some groundwork for future support of the regional states for Iraq's unity government, and also to talk to them about concerns that they have about the course of events in Iraq. And so that was really useful time.

The GCC+2, despite its awkward name, Glenn, is becoming -- (laughter). Remember, Glenn, Germany was unified by the 2+4 so it tends to be the way international bodies are named. But the GCC+2 I think is becoming a very useful forum. It's now met four times since September and people always comment on the usefulness of the discussions, the candidness of the discussions. It's -- as with most things, it's sort of building a kind of momentum of its own as a good forum in which to discuss the complicated issues of the Middle East right now. So in any case, that was part of the trip.

The other major effort was to talk to the Israelis and the Palestinians. I really didn't come out with a preconceived notion of what might be possible. I did think that it was a good opportunity to come and to listen to people as to how they saw the future. I knew that there was momentum that had been generated by the meetings between Abbas and Olmert and, in fact, even before that with the speech that Olmert had given.

But it is a complicated time with all this going on in the Palestinian Authority and so I wanted to see what was possible. And it was really out of the talks with Abu Mazen and then the talks with Prime Minister Olmert that it became clear to me that something along these lines, a sort of informal opportunity to discuss these issues after six years, would be the most useful track to take. And Abu Mazen had mentioned something like this at the time of the Olmert meeting, but I wasn't really clear on what he meant. He talked about a back channel or where the contents weren't known or something like that. And so I was able to get some clarification and I think by talking to people and listening to people we moved the process forward, principally because everybody wants to stay within the context of the roadmap. The roadmap is very important because it's got sequence. Everybody understands the obligations in it. But we had gotten to a place that it was stalled because if they weren't making progress on the first phase of the roadmap they couldn't talk about the end of the roadmap and what might lead to the establishment of a Palestinian state. And I think we broke through that.

The next couple of weeks will be pretty intensive on the diplomatic front. I will obviously have a Quartet on February 2nd and then the next week the Egyptians are coming to Washington, Abu Gheit, and I think that we probably will have others to Washington as well. Undoubtedly, David and Elliott will travel to talk to advisors for Prime Minister Olmert and for President Abbas. I don't know precisely when they'll do that, but obviously we'll want to try and prepare the ground before I go back. And I would anticipate going back sometime in the first half of February. I have some constraints because of budget testimony and a conference that I have to chair on Liberia, but aside from that I plan to try to go back in the first half of February.

We will spend, I think, a good deal of time really trying to think about the agenda for this, to see what the parties want to put on the agenda. It really should be up to them to put anything on the agenda that they'd like, but it's very important to think about the establishment of the Palestinian state as having many different facets. There's a tendency to go to the big three issues right away, but in fact there are many other things that would have to be achieved for a Palestinian state and so I would expect the entire agenda to be there: security, (inaudible) security concerns, the nature of the Palestinian state.

One of the really important (inaudible) of the President on this issue, I think, has been that there has always been a lot of concern about what the borders of a state would be but there wasn't much attention given to its internal composition, democratic processes, institutions. And I find President Abbas more interested in that part of it, in building the institutions as well, and one thing that I think or want to do or will want to do over the next several weeks is to talk about what role others are going to play.

This is not just a process that the United States is going to be able to press forward on its own. I think the Arabs obviously have an important role to play, but also the Quartet, I think, Frank-Walter Steinmeier said yesterday, kind of steering group. By that I think he meant what kinds of efforts might be needed by other actors in the international community. You can imagine, for instance, on the economic side, on the institution building side, that there are other countries, perhaps the EU and others, that might be interested in playing a role there. So I think establishing almost an international team or an international consortium to support movement toward a Palestinian state is also extremely important.

We're not yet at the point where I think we can determine what we would do about formal negotiations when and if. It's really a time to try to get the parties into more of a confidence-building phase and we will see what comes after that.

So with that, let me take your questions.

**QUESTION:** Secretary Rice, I have to ask you about this Maliki interview with a group of reporters in Baghdad where he took exception to your response to Senator Biden -- and the context you recall (inaudible) -- and he said that your comments "give morale boosts for the terrorists and push them toward making an extra effort in making them believe they have defeated the American Administration. I can tell you that they have not defeated the Iraqi Government." The particular comment that you said, in fact, at your testimony that Maliki knows he's on -- the Maliki government in a sense -- "I saw his resolve. I think he knows that his government is in effect on borrowed time."

**SECRETARY RICE:** First of all --

**QUESTION:** So let me ask you --

**SECRETARY RICE:** Yeah.

**QUESTION:** This is our partner there. We have invested --

**SECRETARY RICE:** Andrea, let me just answer. (Laughter.)

**QUESTION:** She hasn't read it.

Now, that doesn't mean that you don't continue to press for reforms in the states that make up that coalition that are not yet democratic. So I don't think you will ever go completely back in Egypt after the presidential elections that they held when certain taboos about what you could talk about and who you could criticize simply broke.

The Saudis had municipal elections. They've now raised expectations that that process is going to continue and that, in fact, women are going to be included in that process at a point in time. I had very interesting discussions with the Kuwaiti women, who now have the right to vote, about the effect that they think the women's right to vote in Kuwait is having throughout the Gulf. And of course, Jordan has actually been pretty actively reforming its political systems.

So it's -- no one ever expected that there would be a complete democratic revolution throughout the Middle East overnight, but you have had some very important democratic breakthroughs. And part of the goal is to safeguard those as you continue to press for political reform, and we're going to continue to press for political reform.

QUESTION: Madame Secretary, coming back to the Arab-Israeli question.

SECRETARY RICE: Yes.

QUESTION: I mean, you act as thought this is somehow new, but I mean it's -- back in 2000 there was a summit with the leader of -- the Israelis' leader, the Palestinians, who met for all those days and talked about all these issues. Will the U.S. at some point be ready to put down some bridging proposals to have that kind of summitry?

SECRETARY RICE: Barbara --

QUESTION: What is new and different? It seems to me that Olmert now is weaker, frankly, than Barak was, and certainly Abbas is weaker than Arafat was.

SECRETARY RICE: Well, Barbara, let me just go to the premise that 2000 is just like 2007.

QUESTION: I'm not saying -- I'm saying that we're actually farther along in --

SECRETARY RICE: Yeah, but let's look at where it really was in 2000, all right? You had Yasser Arafat, who I think now who had one foot in terror and one foot in politics. I would submit to you you were never going to get a Palestinian state and peace with Israel under those circumstances. And if you'll remember, we caught him a couple years later taking arms from Iran through the Karine A. So I just don't think that you can make a comparison between Yasser Arafat and Abu Mazen, somebody who's clearly committed to peace and who's prepared to stand on a peace platform. There's a reason Yasser Arafat couldn't make a deal.

It's also the case that you had at that time a Palestinian Authority that was overrun by corruption, overrun by its ties with terrorism. And you -- and strangely, you had Hamas, of course, sitting out as a resistance movement, not at all, by the way, involved in the politics at all. Now, I know that the inclusion of Hamas into the political system for elections has made things in some sense more complicated, but it has also made Hamas contest in the political system, and their inability to govern has led Hamas to, I think, some very -- to a very difficult situation in which they're trying to find their ways out. So the differences on the Palestinian side are very fundamental from 2000.

The differences on the Israeli side are also very fundamental. Do you really think that Ariel Sharon was going to support the Camp David Accords -- Likud? Doesn't look like it, does it? Because in fact, the -- what has happened now is that by 2003 Ariel Sharon was able to -- was willing to make a shift for the right of the Israeli political spectrum and to begin to talk about dividing the land. The Herzliya speech was one of the most important speeches in Israeli political -- recent Israeli political history. He starts to talk about dividing the land. He accepts the two-state solution. He accepts the roadmap. And now the breadth of the Israeli political system that is actually united behind a two-state solution is very different than in 2000.

Finally, the Arabs in 2000 -- not really very involved in that process. And so I think you can -- yes, I think on paper there was a lot that was close. But the underlying circumstances, the ones who had to accept it, support it, I think those conditions are better now. But I totally agree that the proof will be in the pudding. We'll see how far they're able to go, given their specific political conditions today.

QUESTION: And can you anticipate bringing bridging proposals at some point?

SECRETARY RICE: Barbara, I'm not going to get ahead of the discussions I have with --

QUESTION: Madame Secretary --

SECRETARY RICE: First, I just totally (inaudible).

QUESTION: Okay. I'm just curious what you think the next steps might be on the Iranian nuclear front. I mean, it's -- when the 60 days will be up towards the end of next month, I guess. There's the sense out there that you think the Chapter 7 nature of this is sufficient. And I'm just wondering whether there is really the likelihood of yet another attempt at a resolution.

SECRETARY RICE: Well, there will be a review after 60 days. And I think at that point we can determine whether it's time for an immediate -- immediately for a new resolution or for -- you know, that augments the resolution that's already in place, whether or not states are going to take further steps that might not be in the resolution but that might be supportive of the resolution.

I think over the next month or so, we're going to just have some -- have to have consultations about what next steps will be. But I think the achievement of a Chapter 7 resolution is a pretty important step. And I don't really think it's sufficient. I think I made clear that I -- that there are going to have be steps outside of that. But whether or not there are also steps inside the Security Council, I think we just have to evaluate.

QUESTION: Is there anything promising about what happened since that was put in place that you think has made a difference?

SECRETARY RICE: Well, what's promising is that the Iranians seems to be concerned about the effect that some of the private decisions, private sector decisions that are being made are --those decisions are having on their economy and apparently in their politics. And I think that's good.

QUESTION: Thanks. Also underlying -- does it look to you like the Iranians and the U.S. are now drifting -- I mean, I'm sorry, the Iraqi Government and the U.S. are drifting in different directions on that? You probably noticed that Hoshyar Zebari gave an interview this week in which he said: we want to continue to tighten our relations with the Iranians, we want to (inaudible) those offices that the U.S. raided and the consulates, we want to open more border crossings and so on and so forth.

SECRETARY RICE: I think there is no problem with the Iraqis increasing normal state-to-state relations with the Iranians. Maybe under those circumstances the Iranians will be more constructive. But when we find them doing things that are not constructive and particularly that are dangerous to our forces, then I think we've been very clear that we're going to go after those activities.

And the Iraqi Government, when they claimed to be diplomats and they were -- the first set claimed to be diplomats, carrying diplomatic passports, the Iraqi Government did the right thing. They were found doing activities that were not consistent with their diplomatic status and they were expelled. And so I think we can work very closely

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ESTATE OF MARK PARSONS, by and through its Administrators, et al. | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Civil No. 07-cv-1847 (JR) |
| | : | |
| v. | : | |
| | : | |
| THE PALESTINIAN AUTHORITY, et al | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**ORDER**

This matter having come before the Court on Defendants' Motion to Dismiss and the Court having been sufficiently advised, it is hereby ORDERED and ADJUDGED that Defendants' motion is hereby DENIED.

IT IS SO ORDERED on this the _____ day of _____, 2008.

_____
Hon. James Robertson
United States District Court for the
 District of Columbia